MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., a corporation, Plaintiff,

v.

DEVON BANK, an Illinois banking corporation, Defendant.

DEVON BANK, an Illinois banking corporation, Third–Party Plaintiff,

v.

CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a national banking association, and Crocker National Bank, a national banking association, Third–Party Defendants.

No. 83 C 2422.

United States District Court, N.D. Illinois, E.D.

Nov. 4, 1988.

654

Peter A. Cantwell, Andrew V. DePaul and Stephen E. Smith, Cantwell, Smith & Van Daele, Chicago, Ill., for plaintiff.

Marc O. Beem and Michael L. Shakman, Krupp & Miller, Chicago, Ill., for defendant.

Michael J. Sweeney, Robert D. McLean and Joshua J. Mintz, Sidley & Austin, Chicago, Ill., for Crocker Nat. Bank.

Richard H. Ferri and Paul K. Vickrey, Chicago, Ill., for Continental Illinois Nat. Bank and Trust Co.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

In this opinion, we consider matters taken under advisement in our opinion of October 24, 1988. In our prior opinion, we noted that this suit was before the District Court for a second time. District Judge George N. Leighton, now retired, previously granted the motion of defendant Devon Bank ("Devon") for summary judgment against the plaintiff Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"). 654 F.Supp. 506 (N.D.Ill.1987). The United States Court of Appeals for the Seventh Circuit subsequently reversed and returned the action to this Court. 832 F.2d 1005 (7th Cir.1987). After the Seventh Circuit opinion, Devon brought a new motion for summary judgment, and the two third-party defendants, Crocker National Bank ("Crocker") and Continental Illinois National Bank ("Continental"), filed separate mo-

tions to dismiss. In our prior opinion, 123 F.R.D. 569, we denied Devon's new motion for summary judgment, and in our present opinion, we consider the two motions to dismiss. For the reasons described below, Crocker's motion is granted and Continental's motion is granted in part and denied in part.

## I. Factual Background

On July 26, 1979, the plaintiff Merrill Lynch received a $647,250 check from Manus, Inc. ("Manus"), one of its customers. This check was drawn on Manus' account with Devon in Chicago and was deposited by Merrill Lynch that same day in its account at Crocker. The next day, July 27, 1979, Manus deposited a check for the same amount in its account at Devon. This second check was drawn by Cash Reserve Management, Inc., a Manus subsidiary, on the New England Merchants National Bank of Boston and was made payable to Manus. It will be referred to as the CRM check. Devon had a correspondent bank relationship with Continental and submitted checks to the larger bank for clearance through the Federal Reserve system. Devon followed its usual procedure in this case and forwarded the CRM check to Continental, which in turn forwarded it to the Federal Reserve system. Devon also placed a "hold" on the CRM check, meaning that Manus could not draw against the funds for three or four business days after Devon received it. Once again, this was in accord with Devon's usual procedure.

Meanwhile, Crocker had placed the Manus check into the Federal Reserve system, and it was presented to Devon on Wednesday, August 1, 1979. August 1 was the fourth business day (the fifth, if one counts Saturday, July 28) since Devon had received the CRM check. The hold, therefore, was no longer in effect, and Devon's computer indicated that there were sufficient funds to cover the Manus check. Accordingly, Devon followed the normal steps to pay the Manus check: It verified the signature, apparently stamped "paid" on the check and placed it in the file for the Manus account. Devon completed those procedures sometime in the afternoon of Thursday, August 2. The Court of Appeals held that by doing so, Devon completed the "process of posting" as defined in section 4–109 of the Uniform Commercial Code ("UCC"). Therefore, the Manus check was "finally paid" and Devon was "accountable" for it under section 4–213.

Unbeknownst to Devon, however, the CRM check had bounced. The Federal Reserve Bank of Boston informed Continental of this fact by wire sometime on Tuesday, July 31. Continental attempted to notify Devon sometime on the afternoon of Wednesday, August 1, but did not succeed, since Devon was closed on Wednesdays, and its switchboard was shut down after 1:00 p.m. Continental did not attempt to notify Devon on Thursday, August 2, and as described above, the Manus check became finally paid by the operation at law sometime that afternoon. Continental received the returned CRM check on Friday, August 3; it was only then, at 4:10 p.m., that Continental notified Devon that the check had bounced. Without the CRM check, Manus' account had insufficient funds to cover the Manus check. Therefore, Devon gave wire notice to the Federal Reserve Bank of Chicago that it was dishonoring and returning the Manus check.

As it promised, Devon returned the Manus check to the Federal Reserve system, and on August 10, Crocker received the check for a second time. The parties dispute whether Crocker informed Merrill Lynch that the Manus check had been returned and whether Merrill Lynch instructed Crocker to redeposit the check. In any event, Crocker did redeposit the check, and it made its way back to Devon on August 13. On August 14, Devon dishonored the check a second time and returned it. Sometime near the end of August, Manus was placed in receivership and was prohibited from paying Merrill Lynch or any of its other creditors.

## II. Previous Proceedings

Rather than pursuing the bankrupt Manus, Merrill Lynch first brought suit against Devon and Crocker in the United States District Court for the Central District of California. This litigation will be

referred to as the California case. The court dismissed Devon from the California case for lack of personal jurisdiction, and Merrill Lynch and Crocker later settled that suit.

Merrill Lynch then brought the present suit against Devon. Devon, in turn, brought third-party actions against Crocker and Continental, asserting that if Devon were liable to Merrill Lynch, then Crocker and Continental were liable to Devon. After the parties conducted discovery, Devon moved for summary judgment against Merrill Lynch. Continental moved for summary judgment against Devon, and Crocker moved to dismiss Devon's third-party complaint for failure to state a claim upon which relief can be granted. Judge Leighton granted Devon's motion for summary judgment against Merrill Lynch, thus mooting Crocker's and Continental's motions. 654 F.Supp. 506 (N.D.Ill.1987). The Court of Appeals, however, reversed the grant of summary judgment. 832 F.2d 1005 (7th Cir.1987). Upon remand, Devon brought a second motion for summary judgment based on Merrill Lynch's alleged failure to mitigate the damages caused by Devon's dishonor of the Manus check. We denied this motion in an opinion dated October 24, 1988. Crocker also renewed its motion to dismiss, and Continental brought a separate motion to dismiss. Both Crocker and Continental contend that Devon has failed to state a claim upon which relief can be granted.

### III. Devon's Claim Against Crocker

Devon's third-party complaint against Crocker is made as an alternative to its motion for summary judgment against Merrill Lynch. In the motion for summary judgment, Devon asserts that Merrill Lynch should be liable on the Manus check, since Crocker informed Merrill Lynch on August 10 that the check had been returned. Nonetheless, according to Devon, Merrill Lynch did nothing to mitigate its damages, even though it later alleged in the California case that it would have obtained cleared funds from Manus had it known that the check had been returned.

In the third-party complaint which we consider here, Devon argues that if the Court finds that Crocker did not inform Merrill Lynch, and if Devon is found liable as a result, then Crocker should be liable to Devon for its failure to inform Merrill Lynch. Devon makes this alternative claim in three counts: Count V, a statutory claim under the Uniform Commercial Code; Count VI, a negligence claim; and Count VII, a restitution claim. Crocker responds that none of these are claims upon which relief can be granted and accordingly moves to dismiss.

In considering Crocker's motion, we must presume the truth of the allegations in Devon's third-party complaint along with reasonable inferences flowing from those allegations, viewing them in the light most favorable to Devon. *See Moon v. Phillips*, 854 F.2d 147, 150 (7th Cir.1988). We cannot grant the motion to dismiss unless it appears beyond doubt that Devon can prove no set of facts which would entitle it to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Foote v. United States*, 648 F.Supp. 735, 736 (N.D.Ill.1986) (Aspen, J.). Applying this standard to Devon's claim, we must dismiss for failure to state a cause of action against Crocker.

#### A. *The Statutory Claim*

■ California law governs our decision as to liability between Devon and Crocker.[1]

---

1. When sitting in diversity, a federal court must apply the conflict of laws principles of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Travelers Insurance Co. v. Transport Insurance Co.*, 846 F.2d 1048, 1051 (7th Cir.1988). Illinois law has adopted the choice of law rule of section 4–102(2) of the UCC:

The liability of a bank for action or non-action with respect to any item handled by it for purpose of presentment, payment or collection is governed by the law of the place where the bank is located. In the case of action or non-action by or at a branch or separate office of a bank, its liability is governed by the law of the place where the branch or separate office is located.

Ill.Rev.Stat. ch. 26, § 4–102 (1987). Since Crocker is located in California, we apply California law to Devon's statutory claim.

Like every other state in the Union, California has adopted Article 4 of the UCC to resolve disputes involving bank deposits and collections. Under Article 4, Devon is considered the payor bank for the Manus check because it is the bank by which the Manus check was payable as drawn. Cal. Com.Code § 4105(b) (West 1964). Crocker, by contrast, is considered both a depository bank, because it was the first bank that handled the check for collection, and a collecting bank, because it was one of the banks other than the payor bank that handled the check for collection. *See id.* § 4105(a), (d).

■ Section 4–202 of the UCC defines the duties of a collecting bank that are relevant to Devon's third-party complaint against Crocker:

(1) A collecting bank must use ordinary care in

\* \* \* \* \* \*

(b) Sending notice of dishonor or nonpayment or returning an item other than a documentary draft to the bank's transferor after learning that the item has not been paid or accepted, as the case may be. . . .

*Id.* § 4202(1)(b). By its terms, the duty of ordinary care established in § 4–202(1)(b) seems to run only to the collecting bank's transferor, in this case, Merrill Lynch; if Crocker failed to inform Merrill Lynch that the Manus check had been returned, it would seem only to have breached the duty owed to Merrill Lynch. Nonetheless, Devon claims that it was a third-party beneficiary of Crocker's duty to Merrill Lynch and that Crocker is therefore liable to Devon.

We disagree. The cases cited by Devon, and in particular *Allied Concord Financial Corp. v. Bank of America National Trust & Savings Association*, 275 Cal. App.2d 1, 80 Cal.Rptr. 622 (2d Dist.1969), do not support the third-party beneficiary theory that Devon espouses. In *Allied Concord*, the plaintiff Allied issued a check drawn on Bankers Trust and made out to Sandor Spector. The check, however, was intercepted by Sandor's brother John, who forged the endorsement and cashed the check at City National Bank ("City"). City endorsed the check to Bank of America, who forwarded it to Bankers Trust. Bankers Trust paid the check, charged Allied's account and returned the cancelled check to Allied. Allied did not discover the forgery until more than a year later, and by then it was too late to sue Bankers Trust for paying the check over a forged endorsement. *See* UCC § 4–406(4). As a result, Allied attempted to sue City and Bank of America.

The California Court of Appeals held that Allied could directly sue City and Bank of America,[2] but then held that the two banks were protected by the same statute of limitations as Bankers Trust. The court based its decision in large part on judicial economy. Allied, except for the statute of limitations, could have sued Bankers Trust under section 4–401 for improperly paying the check over a forged endorsement. Bankers Trust, in turn, could have sued City and Bank of America under section 4–207(1)(a) for breaching their warranties of title, since the endorsement was forged. Accordingly, it made sense to permit Allied to sue City and Bank of America directly. As the court noted, "The modern trend of

---

The parties appear to assume that California law applies to the negligence and restitution claim as well, and we conclude that this is the correct result. By its terms, UCC section 4–102 seems to apply to actions involving check collection based on non-UCC theories. This conclusion is supported by the rationale behind section 4–102: "The routine and mechanical nature of bank collections makes it imperative that one law govern the activities of one office of a bank." Ill.Ann.Stat. ch. 26, § 4–102 comment 2a (West 1963). This rationale applies equally well to actions based on theories outside the UCC, such as negligence or restitution.

2. Crocker characterizes the court's discussion of the banks' liability to Allied as dicta, since the court went on to hold that Allied's action was barred by the statute of limitations. To be sure, the court could have decided the case merely on the basis of the statute of limitations, but for whatever reason, it considered the banks' liability to Allied in detail. Even if the discussion is dicta, it is entitled to our consideration.

procedure looks on circuity of action with disfavor." 80 Cal.Rptr. at 624.

The circuity argument, however, does not apply to the present case. If Crocker did not notify Merrill Lynch that the Manus check had been dishonored and returned, then Crocker breached its duty to Merrill Lynch under UCC section 4–202. Merrill Lynch could (and indeed did) sue Crocker for the breach of this duty, so the first link in the claim has been established. The second link, however, is missing. Merrill Lynch did not breach any of the duties it owed to Devon under UCC section 4–207(1). Under that section, Merrill Lynch warranted that it had good title to the Manus check, that it had no knowledge that the signature was unauthorized and that the check was not materially altered. Devon has not alleged that any of these warranties was breached, so it could have no cause of action against Merrill Lynch. And since it could not sue Merrill Lynch, it should not be allowed to sue Crocker. Judicial economy would not be served by allowing Devon to sue on a non-existent cause of action.

Judicial economy, however, was not the only basis for the *Allied Concord* decision. As Devon takes pains to note, the California court also relied on third-party beneficiary theory: "On third-party beneficiary principles we think the benefit of warranties given by a bank which negotiates a check on a forged endorsement extends by implication to the drawer of the check." 80 Cal.Rptr. at 624. Devon asks us to extend the third-party theory of *Allied Concord* and apply it to the present case.

We decline the invitation. As one commentator has noted, *Allied Concord's* invocation of third-party beneficiary theory was "highly fictional," and was justifiable only because of the drawer Allied's "close deposit relationship" with the drawee Bankers Trust, "to whom the warranty of title clearly r[an]." B. Clark, *The Law of Bank Deposits, Collection and Credit Cards* ¶ 6.4[5][b][iii] at 6–59 (rev. ed. 1981). No such justification exists here. There was

no "close deposit relationship" between Devon and Merrill Lynch. They came into contact not by mutual choice, as in the drawer-drawee relationship, but only because the drawer Manus happened to owe Merrill Lynch money and happened to have an account with Devon.

Moreover, *Allied Concord's* third-party beneficiary theory actually collapses into the prevention of circuity of action and the promotion of judicial economy. One sentence after alluding to third-party beneficiary theory in support of its holding, the California court stated that "[b]y allowing direct suit we reduce circuity of action and make litigation easier between parties located in different jurisdictions." 80 Cal. Rptr. at 624. It might be noted here that the California Supreme Court, although it followed *Allied Concord* and concluded that a drawer could bring a direct suit against a collecting bank, found it "unnecessary to rely on third-party beneficiary principles in reaching this conclusion." *Sun 'n Sand, Inc. v. United California Bank*, 21 Cal.3d 671, 681, 582 P.2d 920, 928, 148 Cal.Rptr. 329, 337 (1978).

■ Finally, even if we were to apply third-party beneficiary theory to the present case, Devon could not recover against Crocker. The California Supreme Court has used the following six criteria to determine when a duty is owed to third persons:

(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.

*J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 804, 598 P.2d 60, 63, 157 Cal.Rptr. 407, 410 (1979); *see also Seeley v. Seymour*, 190 Cal.App.3d 844, 860, 237 Cal.Rptr. 282, 291 (1st Dist.1987).[3] Applying these criteria,

---

**3.** This is the test that California courts apply to determine whether a party should be held liable

in negligence to third-parties with whom he has had no dealing. Our research has uncovered no

we find that only one favors imposing liability on Crocker. We will consider each of the criteria in turn. First, the "transaction" in question—informing Merrill Lynch that the Manus check had been returned—was intended for the benefit of Merrill Lynch. Second, it was not foreseeable that Devon would be harmed by Crocker's failure to inform Merrill Lynch. As Crocker notes, Devon's position "would seek to impose clairvoyance upon Crocker in knowing that Devon had already finally paid the Manus Check at the time that check was returned to Crocker for insufficient funds." Crocker's Reply at 7. Third, and this is the only factor favoring Devon, it is certain that Devon will be harmed if it is held liable to Merrill Lynch. Fourth, Crocker's conduct was not that close to Devon's injury. There were other links in the chain, especially Manus' failure to have sufficient funds and its subsequent bankruptcy. Fifth, although it is difficult for us to know what moral standards a California court would apply, it seems highly unlikely that moral blame would attach to Crocker, even if it did fail to inform Merrill Lynch. Sixth, Crocker's duty to Merrill Lynch, under UCC section 4–202, provides a sufficient mechanism for preventing future harm without imposing liability on Crocker in this case.

In short, only the third criterion—the degree of certainty that Devon suffered injury—is met in this case. Accordingly, we conclude that the California Supreme Court would not hold Crocker liable for breach of a statutory duty, even if the court did apply the third-party beneficiary principles suggested by *Allied Concord.* We note that our decision is supported by a leading commentator: "The [collecting] bank is not liable for failure to exercise ordinary care except to its customer or to the owner of the item." H. Bailey, *Brady on Bank Checks* ¶ 11.7 at 11–14 (6th ed. 1987). In addition, we also note that our decision is supported by dicta in *Fireman's Fund Insurance Co. v. Security Pacific National Bank,* 85 Cal.App.3d 797, 821, 149 Cal.Rptr. 883, 899 (2d Dist.1978). In *Fireman's Fund,* the defendant was the depository and collecting bank for a check honored over a forged drawer's signature. The drawer's insurer brought suit against the defendant, alleging, *inter alia,* that the defendant had breached its duty of ordinary care under UCC section 4–202 by presenting the forged check to the payor bank. The somewhat confusing decision rejects this argument and appears to hold that the duty of ordinary care in presentment was not breached by the defendant's failure to detect the forged drawer's signature. 85 Cal.App.3d at 820–21, 149 Cal. Rptr. at 899. The court went on to state, apparently as dicta or perhaps as an alternative holding, that the duties established under section 4–202 "should be imposed only by the owner of the instrument who initiates collection or by a prior collecting bank." *Id.* at 821, 149 Cal.Rptr. at 899. Applying this principle, Devon should not be able to impose liability on Crocker, since Devon was neither the owner nor a prior collecting bank. Admittedly, this statement taken by itself is a rather slender reed on which to build our decision, but it does support our conclusion that Crocker did not breach a statutory duty owed to Devon.

### B. *The Negligence Claim*

Devon also alleges that Crocker's failure to notify Merrill Lynch was negligent and that Crocker is liable to Devon as a result. Devon's negligence argument and its statutory claim are closely related, and it is difficult to determine where the one leaves

---

cases in which a California court has applied this test to a statutory duty like the one in the present case. Nonetheless, we believe that a California court would apply the negligence-based test to determine whether the statutory duty of ordinary care under UCC section 4–202 runs to third-parties. We do not believe, as Crocker suggests, that California courts would apply the third-party beneficiary principles of contract law. Under contract law, a third-party

may bring suit on a contract only if the contract was made expressly for his benefit. Cal.Civ. Code § 1559 (West 1982); *Staples v. Hoefke,* 189 Cal.App.3d 1397, 1414, 235 Cal.Rptr. 165, 176 (2d Dist.1987). However, Crocker's duty to Merrill Lynch was not imposed by contract, but rather, like the duty of care in negligence law, was imposed by law. Accordingly, we will apply the negligence-based test quoted in the text.

off and the other begins. Indeed, Crocker treats the statutory and negligence claims, as well as the restitution claim, as mere variants of one another. Nonetheless, we are compelled to consider the negligence claim separately, since we have a duty "to examine the complaint to determine if the allegations provide for relief on any possible theory." 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357 at 602 (1969); *see also Grove School v. Guardianship and Advocacy Commission*, 596 F.Supp. 1361, 1366 (N.D.Ill.1984) (Shadur, J.).

Devon correctly asserts that the UCC does not generally displace common law negligence actions. UCC section 1–103 provides that "[u]nless displaced by the particular provisions of this code, the principles of law and equity ... shall supplement its provisions." Cal.Com.Code § 1103 (West 1964). It is clear that the duty of ordinary care in UCC section 4–202 does not displace negligence; if anything, section 4–202 is a restatement of the negligence standard. *Cf. Sun 'n Sand, Inc. v. United California Bank*, 21 Cal.3d 671, 696, 582 P.2d 920, 937, 148 Cal.Rptr. 329, 346 (1978) (UCC section 3–405, dealing with imposters and fictitious payees in commercial paper, does not preclude negligence action); *Joffe v. United California Bank*, 141 Cal.App.3d 541, 557, 190 Cal.Rptr. 443, 452 (2d Dist.1983) (UCC sections 3–116, dealing with commercial paper made payable to more than one person, and 3–117, dealing with commercial paper made payable to a person with words of description, do not preclude negligence action). Nonetheless, we conclude that even though section 4–202 does not preclude recovery for negligence, recovery for negligence is not available in this case. Actionable negligence under California law is comprised of three distinct elements: "Legal duty to use due care, a breach of that duty, and a proximate or legal causal connection between the breach and the injuries suffered by plaintiffs." *Toscano Lopez v. McDonald's*, 193 Cal.App.3d 495, 513, 238 Cal. Rptr. 436, 447 (4th Dist.1987); *see also United States Liability Insurance Co. v. Haidinger–Hayes, Inc.*, 1 Cal.3d 586, 594,

463 P.2d 770, 774, 83 Cal.Rptr. 418, 422 (1970). To be certain, Crocker owed a duty to Merrill Lynch, and it breached that duty if it failed to notify Merrill Lynch that the Manus check had been returned. That, however, is not the issue here; rather, the issue is whether Crocker owed any duty to Devon.

The question of duty has proved difficult for the California courts, as it has for other courts and commentators. As one California court concedes, "Judicial treatment of the concept of 'duty' within the negligence context has left a legacy of analytical confusion." *Toscano Lopez*, 193 Cal.App.3d at 504, 238 Cal.Rptr. at 440. In order to deal with this confusion, the California Supreme Court has identified a number of policy considerations that a court should balance before imposing a duty. These factors include

> "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."

*Sun 'n Sand, Inc. v. United California Bank*, 21 Cal.3d 671, 695, 582 P.2d 920, 936, 148 Cal.Rptr. 329, 345 (1978) (quoting *Rowland v. Christian*, 69 Cal.2d 108, 113, 443 P.2d 561, 564, 70 Cal.Rptr. 97, 100 (1968)). It is evident that this test is quite similar to the previously quoted test for determining when a party owes a duty to a third-party that he does not directly deal with. We conclude that the result is the same under both tests. The two additional factors in the latter test—the burden to the defendant and the community and the availability of insurance—may weigh in favor of imposing liability, since the burden to Crocker is not great, and Crocker may be able to insure itself against the risk. And as noted above, it is certain that De-

von has been injured, or at least will be if found liable to Merrill Lynch. Nonetheless, the other factors weigh against the imposition of liability. Moreover, the California courts have made clear that the " 'chief element in determining whether defendant owes a duty ... to plaintiff is the foreseeability of the risk.' " *Sun 'n Sand, Inc. v. United California Bank,* 21 Cal.3d at 695, 582 P.2d at 397, 148 Cal.Rptr. at 346 (quoting *Dillon v. Legg,* 68 Cal.2d 728, 740, 441 P.2d 912, 920, 69 Cal.Rptr. 72, 80 (1968)). Crocker could not reasonably have foreseen that Devon would be harmed by Crocker's failure to inform Merrill Lynch, since Crocker could not reasonably have known that the check was finally paid. Indeed, the determination that the check was finally paid was not made until eight years after the fact and required four years of litigation and two court opinions. Accordingly, we conclude that Crocker owed no duty to Devon, and that Devon therefore cannot recover in negligence.

### C. *The Restitution Claim*

■ Devon asserts in its amended complaint that if it is found liable to Merrill Lynch, it will be entitled to restitution from Crocker. Devon does not defend this assertion in its response to Crocker's motion to dismiss, except to say that "traditional equitable remedies (like restitution) ... are not generally displaced by the UCC." Devon's Response at 4. We need not determine whether UCC section 4–202 displaces restitution, however, because even if it does not, Devon cannot recover under a restitution theory. Restitution is based on unjust enrichment. *See Branche v. Hetzel,* 241 Cal.App.2d 801, 807, 51 Cal.Rptr. 188, 192 (1st Dist.1966); 1 G. Palmer, *The Law of Restitution* § 1.1 at 5 (1978) (restitution centers on "the unjust enrichment of one person at the expense of another"). When a person is unjustly enriched, he must restore the aggrieved party to his former position by return of the thing or its equivalent in money. *Branche,* 241 Cal.App.2d at 807, 51 Cal.Rptr. at 192; D. Dobbs, *Handbook on the Law of Remedies* § 4.1 at 224 (1973) (restitution is aimed at "forcing the defendant to disgorge benefits that it would be unjust for him to keep"). Devon does not allege that Crocker received anything for failing to inform Merrill Lynch that the Manus check had been returned. Thus, there was no unjust enrichment, and thus there can be no claim based on restitution. Accordingly, Devon's restitution claim, like its statutory claim and its negligence claim, must be dismissed for failing to state a cause of action upon which relief can be granted.

### IV. Devon's Claim Against Continental

Like its claim against Crocker, Devon's third-party complaint against Continental is made as an alternative to its motion for summary judgment against Merrill Lynch. In the third-party complaint, Devon asserts that Continental gave untimely notice that the CRM check had bounced. According to Devon, Continental received notice on Tuesday, July 31, 1979, that the CRM check had bounced, yet did not give notice to Devon until Friday, August 3, 1979, at 4:10 p.m. Without the CRM check, Manus' account at Devon had insufficient funds to cover the Manus check. Accordingly, at 4:22 p.m., only twelve minutes after learning the CRM check had bounced, Devon wired the Chicago Federal Reserve Bank that it was dishonoring the Manus check. But it was too late; as the Court of Appeals held, the Manus check was finally paid on the afternoon of August 2, when Devon completed the process of posting. As a result, unless this Court finds that Merrill Lynch failed to mitigate damages, Devon will be liable to Merrill Lynch for the Manus check. If it is found liable, Devon asserts, then Continental should be liable to Devon for the untimely notice that it gave.

Devon makes its claim against Continental in four counts: Count I, a statutory claim under the Uniform Commercial Code; Count II, a negligence claim; Count III, a bad faith claim; and Count IV, a restitution claim. Continental has moved to dismiss the four counts under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Despite its characterization of the motion, Continental alludes to facts outside the pleadings in arguing that

Devon's third-party complaint should be dismissed. In deciding a motion under Rule 12(b)(6), a court generally considers only the facts pleaded in the complaint. *See Ghouth v. Conticommodity*, 642 F.Supp. 1325, 1327 (N.D.Ill.1986) (Aspen, J.). Rule 12(b) does provide a mechanism by which we can convert a motion under Rule 12(b)(6) to a motion for summary judgment under Rule 56, but to do so, we must give all parties appropriate notice and provide an opportunity to supplement the record. *See Beam v. IPCO Corp.*, 838 F.2d 242, 244 (7th Cir.1988). All of that is unnecessary in this case, however, because even if we do consider facts outside Devon's third-party complaint, we must still deny summary judgment.

### A. *The Statutory Claim*

Illinois law and, in particular, the Illinois version of the UCC governs our decision as to liability between Devon and Continental. *See* Ill.Rev.Stat. ch. 26, § 4–102(2) (1987); *see also supra* note 1. Under the UCC, Continental is considered a collecting bank with regard to the CRM check, since it was one of the banks, other than the payor bank, handling the check for collection. *See* Ill.Rev.Stat. ch. 26, § 4–105(d) (1987). Section 4–202 of the UCC defines the duties that Continental owed to Devon on the CRM check:

(1) A collecting bank must use ordinary care in

\*　　\*　　\*　　\*　　\*　　\*

(b) sending notice of dishonor or nonpayment or returning an item ... to the bank's transferor ... after learning that the item has not been paid or accepted, as the case may be ...

\*　　\*　　\*　　\*　　\*　　\*

(2) A collecting bank taking proper action before its midnight deadline following receipt of an item, notice or payment acts seasonably; taking proper action within a reasonably longer time may be

seasonable but the bank has the burden of so establishing.

*Id.* § 4–202. In this part of our opinion, we need not consider how far Continental's duty extends, since it clearly extends to Devon, its transferor. Accordingly, Continental had until its "midnight deadline" to notify Devon that the CRM check had bounced. Under section 4–104(1)(h), the midnight deadline is "midnight on [the bank's] next banking day following the banking day on which it receives the relevant item or notice." *Id.* § 4–104(1)(h). According to Devon, Continental received wire notice on Tuesday, July 31, 1979, that the CRM check had bounced, and therefore its midnight deadline was midnight on Wednesday, August 1.

■ In reply, Continental asserts that its midnight deadline was actually midnight on Thursday, August 2. Continental relies on UCC section 4–107, which states:

(1) For the purpose of allowing time to process items, prove balances and make the necessary entries on its books to determine its position for the day, a bank may fix an afternoon hour of 2 P.M. or later as a cut-off hour for the handling of money and items and the making of entries on its books.

(2) Any item or deposit of money received on any day after a cut-off hour so fixed or after the close of the banking day may be treated as being received at the opening of the next banking day.

*Id.* § 4–107. Going outside the facts pleaded in Devon's third-party complaint, Continental asserts that in 1979, it used 2:00 p.m. as its cut-off hour under section 4–107. It further asserts that it did not receive notice concerning the CRM check until Tuesday, July 31, at 3:17 p.m. Thus, according to Continental, it should be deemed to have received notice of the CRM check at the opening of business on Wednesday, August 1, and its midnight deadline should be considered midnight on Thursday, August 2.[4]

---

**4.** Continental's argument may seem to be moot, since Continental concedes that it did not give Devon notice until late Friday afternoon; Continental missed its deadline, whether it was Wednesday or Thursday. Continental raises the

issue, however, because of the measure of damages prescribed by the UCC. Under section 4–103(5),

The measure of damages for failure to exercise ordinary care in handling an item is the

We cannot agree. Continental's midnight deadline was not extended by the provisions of section 4–107(2). That section permits banks to treat any "item or deposit of money" that is received after the cut-off hour as being received the next banking day. But a notice of dishonor is neither an item nor a deposit of money. An item is defined as "any instrument for the payment of money even though it is negotiable but does not include money." Ill.Rev.Stat. ch. 26, § 4–104(g) (1987). A notice obviously does not fall within this definition. Nonetheless, Continental argues that we should read the term "item" in section 4–107(2) to include wire notices. To do so would make some sense, since the purpose of the cut-off hour is to give banks a chance to balance their books without working into the evening. *See* Ill.Ann.Stat. ch 26, § 4–107 comment (West 1963). It seems inconsistent to allow a bank to defer the accounting of money, checks and other "items," but not the accounting of notices. In addition, failure to include notices in section 4–107(2) seems to create an anomaly; as Continental puts it, "How inconsistent it would be to say that if a bank receives a returned check after 2:00 p.m. it may deem it to be received the following day, but if it receives notice that the check is on its way back, notice must be deemed to be received on the very day it comes in." Continental's Reply at 7.

Nonetheless, we conclude that section 4–102(2) does not permit a bank to treat a notice received after the cut-off hour as being received the next day. The drafters of the UCC chose to include only items and deposits of money in section 4–107(2) and then cross-referenced to the definition of items in section 4–104. *See* Ill.Ann.Stat.

ch. 26, § 4–104 definitional cross-references (West 1963). Had they wished to include notices, they could have done so. Indeed, when they wished to include both items and notices, they knew how to do so. *See* Ill. Rev.Stat. ch. 26, §§ 4–104(h), 4–302 (1987). Moreover, the disparate treatment of items and notices is perhaps not so anomalous. It seems reasonable to assume that the larger the returned check, the more likely that notice will be given. If a check is large enough to justify notice, then the amounts involved probably are too large to treat the notice as received the next day. At any rate, even if the structure of section 4–107(2) does create an anomaly, we are unwilling to remove it. It is not our job to second guess the drafters of the UCC or the Illinois legislators who adopted their handiwork.

■ Continental argues, however, that if we read section 4–107(2) not to include notices, Continental's midnight deadline should be extended to at least midnight on Saturday, August 4. Continental relies on section 4–104(h), which defines the midnight deadline as "midnight on [the] next banking day following the banking day on which [the bank] receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." Ill.Rev.Stat. ch. 26, § 4–104(h) (1987). Continental argues that if the item and the notice are two separate things, then the midnight deadline is measured from the later of the two. Although Continental received the notice on Tuesday, it did not receive the returned item until Friday, and according to Continental's reading of section 4–104(h), this means that its midnight deadline was measured from Friday.

amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence.
Continental argues that meeting its midnight deadline would have constituted ordinary care. If the midnight deadline was midnight on Thursday, Devon would still have been liable on the Manus check, since it had finally paid that check sometime on Thursday afternoon. Thus, even if Continental had informed Devon by midnight Thursday—that is, even if it had exer-

cised ordinary care—the $647,250 represented by the Manus check could not have been realized. Thus, according to Continental, Devon's damages are the amount of the CRM check—$647,250—reduced by the amount that could not have been realized by the exercised of ordinary care—the $647,250 represented by the Manus check—for a total of zero.
We believe this analysis would be convincing if Continental's midnight deadline were midnight on Thursday, August 2. As we explain in the text, however, Continental's midnight deadline was midnight on Wednesday, August 1.

We disagree. To be sure, there is a certain ambiguity in section 4–104(h), but we think Continental is focusing on the wrong "or" in section 4–104(h). The phrase "whichever is later" should be read to modify "the banking day on which [the bank] receives the relevant item or notice" on the one hand, and "the banking day ... from which the time for taking action commences to run" on the other. We note that this is the conclusion reached by the district court in *Lufthansa German Airlines v. Bank of America National Trust & Savings Association,* 478 F.Supp. 1195, 1197–98 (N.D.Cal.1979), *aff'd,* 652 F.2d 835 (9th Cir.1981). Thus, calculating from Tuesday, July 31, the day Continental received notice that the CRM check had bounced, Continental's midnight deadline was midnight on Wednesday, August 1.

■ Continental also argues that because Devon was closed on Wednesday afternoon, Continental's midnight deadline should be extended to midnight on Thursday, August 1. Continental relies in part on section 4–108(2), which reads as follows:

> Delay by a collecting bank or payor bank beyond time limits prescribed or permitted by this Act or by instructions is excused if caused by interruption of communication facilities, suspension of payments by another bank, war, emergency conditions or other circumstances beyond the control of the bank provided it exercises such diligence as the circumstances require.

Ill.Rev.Stat. ch. 26, § 4–108(2) (1987). Devon responds that section 4–108(2) applies only in a limited range of situations, such as emergencies caused by war or acts of God and does not apply to the facts of this case. Again, we disagree. The emphasis in section 4–108(2) is on "circumstances beyond the control of" the collecting bank, in this case, Continental. The fact that Devon was closed on Wednesday afternoon was certainly a circumstance beyond Continental's control, and it brings section 4–108(2) into play. The cases cited by Devon in support of its position are not to the contrary. In these cases, the circumstances that caused delay were not beyond the

control of the bank and therefore did not implicate section 4–108(2). *See Bank Leumi Trust Co. v. Bank of Mid–Jersey,* 499 F.Supp. 1022, 1025 (D.N.J.1980), *aff'd,* 659 F.2d 1065 (3d Cir.1982); *Blake v. Woodford Bank & Trust Co.,* 555 S.W.2d 589, 597 (Ky.Ct.App.1977).

■ Yet, even though section 4–108 excuses Continental's delay, that does not mean that the midnight deadline was extended a full twenty-four hours. The last clause of section 4–108(2) required Continental to "exercise[ ] such diligence as the circumstances require." Whether giving notice by midnight on Thursday was such diligence as the circumstances required is a question of fact, and the burden of proof concerning this fact is on Continental. *See* Ill.Ann.Stat. ch. 26, § 4–108 comment 4 (West 1963). It is not a fact that is suitable for resolution on this motion.

Finally, Continental argues that Federal Reserve regulations support pushing back the midnight deadline to the close of business on Thursday, August 2. Federal Reserve Regulation J, as amended in 1985, provides in part:

> If the day the paying bank is required to provide notice to the depositary bank is not a banking day for the depositary bank, receipt of notice on the depositary bank's next banking day shall constitute timely notice under this paragraph.

12 C.F.R. § 210.12(c)(2) (1988). This regulation was not in effect in 1979, and even if it were, it would not have applied to Continental. Rather, it would have applied to New England Merchants National Bank, the "paying bank" on the CRM check. Nonetheless, Continental argues that the amended Regulation J supports pushing back Continental's deadline for giving notice to the end of business on Thursday, since Devon was closed on Wednesday. Once again, we disagree. At best, Regulation J supports an argument that had Continental notified Devon by end of business on Thursday, it would have acted with the diligence required under section 4–108. That, however, is a matter for the trier of fact, and it cannot be resolved at this time. We conclude, under the facts pleaded in

Devon's third-party complaint, that Continental's midnight deadline was midnight on Wednesday, August 1, 1979, and that Devon accordingly has stated a claim against Continental under Article 4 of the UCC. Continental's motion must be denied as to Count I.

### B. *The Negligence Claim*

In Count II, Devon contends that Continental is also liable for negligence. As noted previously, negligence, like the other "principles of law and equity," supplements the UCC "[u]nless displaced by [its] particular provisions." Ill.Rev.Stat. ch. 26, § 1–103 (1987). Devon argues that the provision of section 4–202 concerning the midnight deadline do not displace the principles of negligence. According to Devon, section 4–202(2) may "imply that the midnight deadline normally defines the limit of due care," but it does not "say that the deadline defines ordinary care in all circumstances, no matter how absurd or unjust." Devon's Response at 16. Under the circumstances, Devon argues, and since the returned CRM check was such a large one, Continental should have notified Devon as soon as possible, on Tuesday afternoon or Wednesday morning.

■ Absent the UCC, a finder of fact might be able to find that Continental should have notified Devon on Tuesday or Wednesday. We conclude, however, that section 4–202(2) does displace negligence. Section 4–202(2) states that a collecting bank taking proper action before its midnight deadline "acts seasonably," and section 1–204(3) equates acting seasonably with acting at or within a "reasonable time." Meeting the midnight deadline is thus acting within a reasonable time, and thus non-negligent as a matter of law. Devon notes, however, that section 4–202(2) requires the collecting bank to take "proper action" and contends that proper action may require action before the midnight deadline. We disagree. Although "proper action" in section 4–202(2) is not defined,

either in the UCC or in any cases that we have found, the most natural reading is those actions specified in section 4–202(1). In this case, proper action was giving notice of dishonor under section 4–202(1)(b) and as long as this was by the midnight deadline, it was seasonable and non-negligent as a matter of law.

■ Section 4–202(2) also displaces normal negligence principles for actions after the midnight deadline, at least as to burden of proof. Under the usual principles of negligence, the party asserting negligence has to prove each of the elements in order to recover. *See, e.g., Lucker v. Arlington Park Race Track Corp.*, 142 Ill.App.3d 872, 873, 97 Ill.Dec. 100, 102, 492 N.E.2d 536, 538 (1st Dist.1986). By contrast, section 4–202(2) puts the burden of proof on the collecting bank, the party defending against the claim of negligence, to prove that its actions after the midnight deadline were reasonable. Accordingly, we conclude that section 4–202(2) displaces the usual principles of negligence, and that Count II must be dismissed for failure to state a claim upon which relief can be granted.[5]

### C. *The Bad Faith Claim*

Count III of Devon's third-party complaint is based on the purported bad faith of Continental. Continental argues that Count III should be dismissed because it merely repeats Count I and does not support an independent cause of action. However, section 4–103(5) of the UCC authorizes consequential damages, in addition to the amount of the check, when there is bad faith. A showing of bad faith would permit an additional recovery, so Count III does represent a claim separate from Count I.

■ The more difficult question is whether the facts alleged by Devon are sufficient to state a claim for bad faith. Bad faith is not defined in the UCC, but

---

**5.** We recognize that our holding concerning negligence is probably of little consequence to this litigation. It appears that Devon made its negligence claim out of fear that this Court would consider Continental's midnight deadline to be midnight on Thursday, and thus dismiss Devon's statutory claim.

good faith is defined by the subjective standard of "honesty in fact in the conduct or transaction concerned." Ill.Rev.Stat. ch. 26, § 1–201(19) (1987). Bad faith then may be defined as the lack of honesty in fact in the conduct or transaction concerned. Devon argues that Continental has shown such a lack of honesty in fact in this case. According to Devon's third-party complaint, Continental knew it was important that Devon be notified of the return of the CRM check, so Continental attempted to notify Devon on Wednesday, August 1. Continental was unable to notify Devon that afternoon, since Devon was closed, so Continental knew on Wednesday afternoon that Devon was unaware of the CRM check's return. Nonetheless, Continental did not again attempt to notify Devon until late Friday afternoon. Devon argues that this sequence of events indicates bad faith on the part of Continental.

We think this is an improbable inference to be drawn from this set of facts. Yet, it is not an impossible one, and on this motion we must resolve all reasonable inferences in favor of Devon. *See Rutan v. Republican Party of Illinois,* 848 F.2d 1396, 1408 (7th Cir.1988). Accordingly, we deny the motion as to Count III.

### D. *The Restitution Claim*

 Devon's restitution claim against Continental must fail for the same reason as its restitution claims against Crocker. To reiterate, restitution is based on unjust enrichment, *see Independent Voters of Illinois v. Illinois Commerce Commission,* 117 Ill.2d 90, 98, 109 Ill.Dec. 782, 786–87, 510 N.E.2d 850, 854–55 (1987), and Devon does not allege that Continental received anything for failing to inform Devon that the CRM check had bounced. There was no unjust enrichment, and there can be no claim based on restitution. Therefore, we grant Continental's motion as to Count IV.

### V. Conclusion

Crocker's motion to dismiss Devon's claims against it is granted. Continental's motion to dismiss Devon's claims against it is denied as to Counts I and III and is granted as to Counts II and IV. It is so ordered.