Defendants, Azalea City Motels, Inc., W.C. Greene, and Paul M. Jackson, appeal a judgment in a nonjury trial in favor of the plaintiff, First Alabama Bank (hereinafter "FAB").
I. The Facts:
Azalea City Motels, Inc. (hereinafter "Azalea City"), is a corporation primarily engaged in the business of buying, managing, and selling hotel and motel properties. The corporation was, during the majority of the period relevant to this litigation, exclusively owned and operated by W.C. Greene and Paul M. Jackson. Azalea City maintained at least one checking account at FAB (formerly the Merchants National Bank of Mobile) under the name "Azalea City Motels, Inc." In 1984, Mr. Greene and Mr. Jackson opened an additional account at FAB under the name "Azalea Management Company" (hereinafter "Azalea Management"). Although Greene and Jackson argue that this account was a trade account for Azalea City, the account's signature card indicates that Greene and Jackson owned the account individually, that they were both authorized signatories for the account, and that the account was listed neither as a corporate account nor as a partnership account.
On October 23, 1984, William Hannah, an associate of Greene and Jackson, issued a check for $100,000 drawn on a trust account at the First National Bank of Livingston, Tennessee (FNBL). The check was made payable to Azalea City Motels, Inc., *Page 969 
but was not indorsed by Azalea City. Instead, the check bore the indorsement of Azalea Management Company and was deposited to the Azalea Management Company account at FAB on October 24, 1984. A day later, an FAB employee incorrectly encoded the check to reflect a $10,000 item rather than a $100,000 item. Consequently, the Azalea Management Company account was provisionally credited $10,000 instead of $100,000.
FAB then sent the check to the New Orleans branch of the Federal Reserve Bank of Atlanta for collection through the normal check collection process. Relying upon the misencoded information on the check, the New Orleans branch provisionally credited FAB with $10,000 and forwarded the check to the Nashville Federal Reserve branch so that it could present the check to FNBL. Both the Nashville Federal Reserve Bank and FNBL processed the check as a $10,000 item. FNBL received the check on October 26, 1984, paid the item as if it were a $10,000 draft, and deducted a corresponding $10,000 from Hannah's account. On the same day, Hannah issued a stop payment order on the check in the amount of the original instrument. Despite the stop payment order, the check went through the normal sorting and filing procedures at FNBL. Without correcting the encoding error or honoring the stop payment order, FNBL returned the original $100,000 check to Hannah with his statement on October 30, 1984. The evidence fails to indicate whether Hannah entered the stop payment order before or after the Federal Reserve presented the check to FNBL for payment.
Sometime prior to November 5, 1984, the defendants became aware that FAB had miscredited their account. On that date, FAB provisionally credited the Azalea Management account for $90,000, the difference between the original check and the misencoded item. On November 6, 1984, FAB presented a $90,000 adjustment and a photocopy of the check to the Federal Reserve Branch in New Orleans. On November 7, 1984, the Federal Reserve Branch in New Orleans submitted the adjustment to the Federal Reserve Branch in Nashville. The Federal Reserve Branch in Nashville received the adjustment on November 8, 1984. While awaiting final payment of the adjustment, FAB allowed Greene and Jackson to withdraw funds against the $100,000 provisional credit. By November 19, 1984, Greene and Jackson had withdrawn virtually all of the funds from the Azalea Management account.
Meanwhile, the Federal Reserve Branch in Nashville allowed almost 30 days to elapse before it presented the adjustment to FNBL. FNBL received the entry of adjustment on December 4, 1984, and, at that time, informed FAB that it was charging back (debiting FAB) the $100,000 item. The same day, FAB notified the defendants that FNBL had dishonored the item, 41 days after the initial deposit. FAB put a hold on the Azalea Management account on December 5, 1984, but released the hold on December 7, 1984. During the interim, FAB neither returned nor dishonored any items presented for payment against the Azalea Management account.
In March 1985, FAB sued Hannah, individually and d/b/a Southern Properties; Southern Properties, Inc.; Azalea City Motels, Inc.; Azalea City d/b/a Azalea Management; and W.C. Greene. Jackson was not named in the original complaint. In December 1985, FAB obtained a default judgment against Hannah, but was unable to enforce the judgment because the whereabouts of Hannah were unknown. After a lengthy period of relative inactivity in the Azalea Management account, Jackson procured new signature cards on February 14, 1986, and his wife, Barbara, replaced Greene as an owner of and signatory on the account. In April 1986, after the Jacksons had deposited a substantial amount of money to the account, FAB seized the assets and offset them against the $100,000 check from Hannah. In May, FAB amended its complaint, adding Paul Jackson as a defendant in this action. Jackson counterclaimed, alleging that FAB had wrongfully frozen his account and had wrongfully set off assets in the account against the $100,000 check. *Page 970 
Following a nonjury trial on the merits, the trial court, without articulating any findings of fact or conclusions of law, entered a judgment in favor of FAB in the amount of $73,419.46, which sum represents the $100,000 check, less $26,580.54 seized from the Azalea Management account. In addition, the court entered judgment for FAB on Jackson's counterclaim. Azalea City Motels, Inc., W.C. Greene, and Paul M. Jackson appealed.
When the trial court makes no formal findings of fact or conclusions of law, the reviewing court will assume that the trial court made those findings and conclusions necessary to support the judgment rendered. Barrett v. Odom, May DeBuys,453 So.2d 729, 732 (Ala. 1984). Thus, in determining whether the trial court erred in its judgment, we must first look to the theory under which the trial court presumably found the defendants liable; next, we will explore the various defenses that the appellants argue preclude their liability; and finally, we must determine whether FAB acted within its rights when it seized the assets of the Azalea Management account and offset the funds found in that account against its claim.
FAB alleges in its complaint two principal causes of action: indorsement liability under Alabama's version of the Uniform Commercial Code (hereinafter "UCC"), and the common law claim of money had and received. Although not alleged in its complaint, FAB also argues, concomitant to its theory of indorsement liability, that the defendants, as customers, are liable to it based upon their UCC engagement to honor checks deposited to their account. We address the UCC claims together.
 II. Indorsement Liability and Engagement to Honor
The first claim alleged by FAB upon which the trial court may have found the defendants liable is based upon Code 1975, §7-3-414. Section 7-3-414, entitled "Contract of indorser; order of liability," provides:
 "(1) Unless the indorsement otherwise specifies (as by such words as 'without recourse') every indorser engages that upon dishonor and any necessary notice of dishonor and protest he will pay the instrument according to its tenor at the time of his indorsement to the holder or to any subsequent indorser who takes it up, even though the indorser who takes it up was not obligated to do so.
 "(2) Unless they otherwise agree indorsers are liable to one another in the order in which they indorse, which is presumed to be the order in which their signatures appear on the instrument."
Greene and Jackson first argue that the trial court erred in holding them personally liable for the $100,000 check because their individual signatures do not appear on the check as indorsers. It is true that, despite the fact that the named payee was Azalea City, the only indorsement registered on the check was Azalea Management Company. In fact, Azalea City never indorsed the check. Citing Code 1975, § 7-3-401, Greene and Jackson argue that, as a general rule, people are not held liable for checks they did not indorse. They reason, therefore, that because the check does not bear their indorsements, the trial court erred in holding them liable.
FAB responds to this reasoning by pointing out that §7-3-401(2) defines the term "signature" as "made by use of any name including any trade or assumed name, upon an instrument." (Emphasis added.) The official comment to § 7-3-401(2) explains that "[a signature] may be made in any name, including any trade name or assumed name, however false and fictitious, which is adopted for the purpose." Hence, FAB argues that Azalea Management Company is either the trade name or the assumed name of Greene and Jackson and that Azalea Management's indorsement serves as both Greene's and Jackson's indorsements.
The appellants reply to FAB's theory by charging that FAB failed to allege and prove at trial that Azalea Management was in fact a trade name of the individuals Greene and Jackson. Rather, they contend that throughout the trial FAB alleged that Azalea Management Company was a trade *Page 971 
name of Azalea City. Implicitly, appellants contend that in order for FAB to recover at all it must first embrace the proposition that Azalea City was the trade name or alter ego of Azalea Management. After all, unless FAB recognizes that Azalea Management was authorized to sign on behalf of Azalea City, then Azalea Management's indorsement never worked as an effective endorsement to allow negotiation of the instrument. This would be true, because Azalea City, rather than Azalea Management, was named on the check as payee. Code 1975, §7-3-202(2). See, R. White S. Summers, Uniform Commercial Code
§ 13-10 (2d ed. 1980). Once FAB accepts this postulate, appellants reason, FAB cannot obtain personal liability without first piercing the corporate veil. Appellants argue, therefore, that because FAB never attempted to pierce the corporate veil between individuals Greene and Jackson and the corporation, Azalea City, FAB is now estopped from proving personal liability against Greene and Jackson as individuals. We disagree.
The fact that Azalea Management indorsed a check made out to Azalea City does not preclude the trial court's finding of personal liability of Greene and Jackson. The mere fact that the Azalea Management account may have been used as a trade account of Azalea City does not foreclose the trial court from also finding that the Azalea Management account was a personal account of Greene and Jackson. That is, given the evidence presented at trial, these two propositions are not mutually exclusive. FAB's failure to name Greene and Jackson d/b/a Azalea Management as parties to the suit does not preclude the trial court's finding Greene and Jackson personally liable. The signature cards signed by Greene and Jackson when they opened the account indicate that Greene and Jackson were both authorized signatories on the account, that they owned the account as individuals, and that the account was neither a corporate nor a partnership account. Moreover, Greene and Jackson designated the trade name "Azalea Management Company" on their account signature card upon opening their FAB account, and it is that name that appears upon the back of the check in question. Finally, the defendants freely admit that, in addition to business expenses, they paid personal expenses from this account. To suggest now that FAB is foreclosed from arguing on appeal that Azalea Management Company is a trade name under which the individuals Greene and Jackson did business is simply to ignore the facts presented at trial.
Further, Greene and Jackson discount the significance of Code 1975, § 7-3-307, which, in pertinent part, states:
 "(1) Unless specifically denied in the pleadings
each signature on an instrument is admitted. When the effectiveness of a signature is put in issue:
 "(a) The burden of establishing it is on the party claiming under the signature; but
 "(b) The signature is presumed to be genuine or authorized except where the action is to enforce the obligation of a purported signer who has died or become incompetent before proof is required.
 "(2) When signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense." (Emphasis added.)
Greene and Jackson do not deny in the pleadings that "Azalea Management Company" was their authorized signature; neither do they assert in the pleadings that the check made payable to Azalea City was mistakenly or wrongly deposited and credited to the Azalea Management account. Because Greene and Jackson failed to deny specifically in the pleadings that "Azalea Management Company" was their authorized signature, the signature is deemed admitted as theirs under § 7-3-307(1). Even if Greene and Jackson put the effectiveness of that signature in issue, the signature is presumed to be their authorized signature under § 7-3-307(1)(b). While the record clearly indicates that Greene and Jackson chose the name "Azalea Management Company" to represent their individually-owned checking account, the record nowhere implies that Greene and Jackson did *Page 972 
not adopt the Azalea Management indorsement as their own. Consequently, the § 7-3-307(1)(b) presumption dictates that the signature is effective as their indorsement. See, Code 1975, §7-3-307, Comment 1.
Although we conclude that the Azalea Management indorsement served as both an authorized signature of Azalea City and as indorsements of Greene and Jackson, proving the existence of an indorsement is not the only prerequisite to a finding of indorsement liability. The UCC makes it clear that indorsers of checks or other drafts are only secondarily liable to the maker of the note. § 7-3-102(1)(d). "Secondary liability means that the holder may not sue the drawer or indorsers on a check or other draft until certain procedural conditions — presentment, dishonor and notice of dishonor — have been met." Barkley Clark, The Law of Bank Deposits, Collections, and Credit Cards, § 1.3 (rev. ed. 1981). See, § 7-3-501(1)(b), (1)(c), (2)(a), and (2)(b). The appellants argue that neither dishonor nor timely notice of dishonor is present under the facts of this case. Thus, before we may affirm the trial court's judgment in favor of FAB upon these grounds, we must determine whether the prerequisites to indorsement liability exist.
While appellants concede that the threshold requirement of presentment was established at trial, they take issue with the trial court's apparent finding that the second prerequisite was met. Contrary to what the trial court must have found, appellants argue that the check was never dishonored. They suggest, instead, that the partial payment of the check by FNBL constituted final payment under the UCC, and that final payment precludes any later attempt by FNBL to dishonor the check. Alternatively, appellants argue that even if partial payment of the check by FNBL did not constitute final payment, then FNBL's retention of the check beyond its midnight deadline did constitute final payment. In either instance, they reason, the necessary prerequisite of dishonor never occurred, and, thus, the trial court erred in its judgment if its holding was based upon a theory of indorsement liability.
In support of their argument, appellants cite the case ofGeorgia R.R. Bank Trust Co. v. First Nat'l Bank Trust Co.of Augusta, 139 Ga. App. 683, 229 S.E.2d 482 (1976), aff'd,238 Ga. 693, 235 S.E.2d 1 (1977). We quote at length from Professor Barkley Clark's discussion of this case as he addressed it within the context of the underencoding conundrum:
 "Suppose that there is an underencoding situation in which the buyer draws a $500 check in payment for goods; the seller deposits the check; the depositary bank encodes the item for $50; and the item is ultimately paid in the amount of $50 by the drawee bank. The buyer in this case may not be so quick to report this underencoding error. However, when it is discovered, the drawee bank is clearly authorized by the UCC to debit the buyer's account for the extra $450.
 "If the depositary bank has correctly credited the seller in the amount of $500 and received only $50 in remittance proceeds, the drawee bank could be forced to remit the excess $450 on a restitution theory under Section 1-103. Even more clearly, the depositary bank could recover the excess from the drawee on the theory that the drawee became accountable for the true amount of the item ($500) upon paying it.
 "However, if the buyer absconds before the drawee bank has the opportunity to charge his account for the extra $450, can the depositary bank still recover from the drawee? Since the depositary bank's encoding error was the negligent act that made the loss possible, and since the drawee bank is in no way unjustly enriched, the loss would presumably fall on the depositary bank. Although Article 4 does not cover this case specifically, Section 1-103, with its importation into the UCC of common-law negligence theory to fill holes left by the drafters, would seem to be directly in point. In addition, liability for negligent collection under Section 4-202 would lead to the same result. *Page 973 
 "In summary, although specific amendments to Article 4 would help to clear up the problem of loss allocation due to encoding errors, the Article as presently drafted dictates no unfair or incongruous results, except perhaps with respect to wrongful dishonor, at least when the Article is used in conjunction with Section 1-103.
 "A good underencoding case is Georgia Railroad Bank Trust Co. v. First Nat'l Bank Trust Co. of Augusta, where A drew a check to the order of B in the amount of $25,000. B deposited the check in the depositary bank, which mistakenly encoded it as a $2,500 item. The [depositary] bank's electronic equipment read the check according to its magnetic encoding, credited B's account for $2,500, and forwarded the item to the drawee bank, which debited A's account in the amount of $2,500. When B informed the depositary bank of the error, B's account was immediately credited with $22,500. The depositary bank then requested reimbursement from the drawee bank, which refused after being instructed by A not to 'bother' the account. The depositary bank sued the drawee bank for the $22,500 discrepancy and prevailed.
 "The court, in line with the analysis set forth above, concluded that the item had been finally paid within the meaning of Section 4-213(3), so that the drawee bank was accountable for the full, proper amount of the item. The court also cited Section 4-302, since the payor bank had retained the item beyond its midnight deadline. A's contention that payment on the item had been stopped was properly rejected, since the countermand clearly came too late. In the case at hand, the court emphasized that A's account had sufficient funds to shift the loss from the shoulders of the drawee bank. It left open the possibility that it might reach a different result where the drawee bank could not recover from the drawer because of insufficient funds in the account. In such a case, the court suggested, the drawee bank would have a defense or counterclaim which could be asserted against the collecting bank that had [underencoded] the check."
Barkley Clark, The Law of Bank Deposits, Collections and CreditCards, § 10.5[3] (rev. ed. 1981).
FAB, pointing out that the litigation in Georgia R.R. Bank Trust Co. involved an action between the depositary bank and the payor bank, argues that the principles applied by that court do not apply in cases where, as here, the depositary bank is suing its customer. The payor bank, FAB argues, is not a party to this action, and the propriety of its acts or omissions do not figure in a collecting bank's action against its customer. It is seen that this assertion, however, contradicts logic when one considers the following question: If the payor bank's dishonor of the check does not figure in a collecting bank's action against its customer, why, then, is dishonor a prerequisite to a finding of indorsement liability? For us to find that FNBL's actions are totally unrelated to FAB's indorsement liability action against its customer, we must first concede that what will factually constitute final payment when a collecting bank sues a payor bank may not constitute final payment when a collecting bank sues its customer. Such a concession we can not make.
To support its contention that FNBL's failure to dishonor Hannah's check is irrelevant to the controversy between FAB (a collecting bank) and the defendants (its customers), FAB cites two cases: Yoder v. Cromwell State Bank, 478 N.E.2d 131
(Ind.Ct.App. 1985), and Mercantile Bank Trust Co. v. Hunter,31 Colo. App. 200, 501 P.2d 486 (1972). In Yoder, a husband and wife appealed from a summary judgment granted in favor of Cromwell State Bank (hereinafter "CSB") in CSB's suit to recover on three checks. Mr. Yoder had presented the three checks to CSB for deposit into his and his wife's joint account and CSB provisionally credited the account with the amount represented by the checks. Blue Mound Dairy, the maker of the checks, stopped payment, and the payor bank, the State Bank of Worthington, returned the checks to CSB without making *Page 974 
payment. CSB subsequently set off funds found in the Yoders' account against the total amount of the returned checks and brought an action to recover the balance. In affirming the trial court's summary judgment, the Indiana Court of Appeals rejected the Yoders' argument that the payor bank's actions precluded CSB's exercise of its right of charge back:
 "The Yoders insist that factual questions concerning the processing, posting and dishonor procedures followed by the payor bank . . . give rise to the inference that CSB's right of charge-back had terminated. We recall that the provision of Section 4-212(1) which states that a collecting bank's rights to revoke, charge-back and obtain refund terminate if and when settlement for the item received by the bank is or becomes final. The Yoders' argument based on this provision proceeds as follows: if the payor bank, SBW, had completed its process of posting (4-109) before receiving the stop payment orders on the three checks, then the stop-payment orders were too late because the final payment is deemed to have already occurred. (4-213). If final payment had occurred when CSB's right to charge-back terminated (4-212(1)) and the Yoders were no longer liable for the amount of the dishonored checks [sic]. [We assume that what the Indiana court meant to say was: 'If final payment had occurred, then CSB's right to charge-back terminated. . . .'] This line of argument misses the point. The State Bank of Worthington is not a party to this action; whether it followed proper procedures in deciding to dishonor the checks should not be the focus of inquiry in determining the propriety of CSB's claim against the Yoders. The operative facts are that CSB received notice that the items were dishonored by the payor bank and in turn notified the Yoders."
Yoder v. Cromwell State Bank, 478 N.E.2d 131, 134
(Ind.Ct.App. 1985). The Yoder court cites Hunter in support of its reasoning.
In Hunter, the defendant, James M. Hunter, appealed a summary judgment in favor of the plaintiff, Mercantile Bank Trust Company, in an action to recover $37,500 from Hunter on a check payable to and indorsed by Hunter, deposited with Mercantile, and subsequently dishonored by the payor bank. Hunter argued on appeal that summary judgment should not have been entered because it precluded him from pleading the defense of final settlement, which would have required a factual determination as to when the check was presented to the payor bank for payment. Under this theory, Hunter argued that the provisional settlement between himself and Mercantile became final because the payor bank failed to timely dishonor the check, and that, therefore, Mercantile lost its right of refund against Hunter. The Colorado Court of Appeals found Hunter's final settlement argument inadequate as a matter of law. That court acknowledged that UCC § 4-302 does provide, as Hunter contended, that if a payor bank retains a demand item beyond its midnight deadline without settling it, it is accountable for the amount of the item. The court stated, however, that the rule that a payor bank is "accountable" for an item does not mean that there has been a final settlement that would preclude a depositary bank from charging the amount of the item back to its depositor. Section 4-213, the court found, sets forth the circumstances under which a provisional settlement becomes final, and there is no provision that mere accountability of a payor bank for a check is a final settlement, unless the check is actually paid by the payor bank. Since nothing occurred here to cause the provisional settlement to become a final settlement under § 4-213, the court concluded, Mercantile still had a right of refund under § 4-212.
It appears to us that, despite FAB's argument to the contrary, the courts in Yoder and Hunter are not in accord with one another. On the one hand, FAB argues, the Yoder court would, in an action by a depositary bank against its customer, find that the prerequisite of dishonor had been met whether or not final payment had occurred. The rationale offered by that court for such a finding is that, "[g]iven the volume and speed of check processing *Page 975 
it would be unrealistic to require the collecting bank to inquire and ascertain the grounds for and propriety of every item which is dishonored." Yoder, 478 N.E.2d at 135. On the other hand, the Hunter court recognizes, under similar facts, that actual payment of an item by the payor bank will constitute final payment, see UCC § 4-213(1); that final payment will preclude dishonor, see § 3-507(1), (2); and implicitly that final failure to dishonor will discharge indorsers' liability, see § 3-502(2).
We distinguish Yoder from Hunter by noting that the UCC recognizes four instances in which an item is finally paid: when the payor bank pays the item in cash; when the payor bank settles for the item without reserving the right to revoke the settlement; when the payor bank completes the process of posting the item to the account of the maker; and when the payor bank makes provisional settlement for an item and fails to revoke that settlement before midnight of the next banking day following the banking day on which it received the relevant item. Code 1975, §§ 7-4-213(1), 7-4-104(1)(h), and 7-4-302(a). However, only two of these instances are reflected in § 7-3-507(1)(a), namely: when an instrument is presented to a payor bank and either acceptance or payment is refused, or, since we are dealing here with collecting banks, when the instrument is seasonably returned by the midnight deadline. That is to say, while, as a practical matter, we generally recognize the concepts of final payment and dishonor as mutually exclusive principles, a technical reading of these two Code sections suggests that final payment and dishonor are mutually exclusive only when a payor bank pays the item in cash or when the payor retains the item beyond its midnight deadline. Because final payment precludes dishonor in only these two of the four instances in which final payment may potentially occur under § 7-4-213(1), it is technically conceivable that dishonor may occur after final payment occurs when final payment occurs as a result of the payor bank's settling for the item without reserving a right to revoke the settlement, or where final payment occurs as a result of the payor bank's completing the process of posting the item to the maker's account. Yoder, therefore, is clearly distinguishable from Hunter and from the case presently before the Court, because the Indiana court, in Yoder, based its decision upon the Yoders' argument that the posting of checks before stop-payment orders were entered constituted final payment and that final payment terminated CSB's right to charge-back. Thus, technically, in Yoder, dishonor could have occurred after final payment, while in Hunter, and in this case, payment of the item constituted final payment, and final payment precluded the later possibility of dishonor.
We hold, therefore, that under the express provisions of the UCC, FAB has failed to establish and prove a claim of indorsement liability, because it has failed to prove an essential element of that claim: dishonor of the check involved.
By arguing that this Court should adopt the rationale ofYoder and apply it to the facts of the present case, FAB would have this Court hold banking customers strictly liable for any item that they deposit, regardless of whether the banks handling the items are negligent and regardless of whether final payment has occurred (thus precluding proof of dishonor of the item, a necessary element of a claim for indorsement liability). The customers in this case did what all banking customers do: they accepted a check from its maker; they indorsed the check; they deposited the check to their account. From that point, there occurred a series of events, all of which were outside the control of the customers: FAB misencoded the item; the collecting banks failed to identify FAB's mistake; FNBL failed to compare the encoded amount with the actual amount of the check; FNBL returned the draft to its maker; and when the mistake was found and the adjustment entered, the Federal Reserve delayed almost 30 days before presenting the adjustment to FNBL.
When we apply Professor Clark's reasoning, the common law, and the Code to the present case, it becomes apparent that the *Page 976 
defendants may not be held liable under a theory of indorsement liability. The UCC provides that every indorser engages that upon dishonor he will pay the instrument according to its tenor at the time of his indorsement to any subsequent indorser who takes it up. Code 1975, § 7-3-414. FAB took up and indorsed an instrument previously indorsed by Azalea Management on its own behalf, its owners Jackson and Greene, and Azalea City. The Code provides further that an instrument is dishonored when presentment is made and either acceptance or payment is refused or cannot be obtained within the prescribed time, or, in the case of bank collections, when the instrument is not seasonably returned by the midnight deadline. § 7-3-507(1)(a). Here, FAB transferred the instrument to collecting banks, which in turn presented the instrument to FNBL. FNBL made payment on the instrument within the prescribed time and retained the instrument beyond its midnight deadline. Therefore dishonor, as specifically defined in the UCC, did not occur.
The UCC provides that the payor bank becomes accountable for an item upon paying the item. § 7-4-213(1). Like our sister state of Georgia, we hold that the partial payment of the item by FNBL constituted final payment within the meaning of §7-4-213(3), so that the drawee bank was rendered accountable for the full and proper amount of the item. Moreover, even if the partial payment of the $100,000 check did not constitute final payment, FNBL's retention of the item beyond its midnight deadline discharged the appellants' indorsement liability. §§7-4-302, 7-3-507(1)(a).
Issues similar to those with which the Georgia court was so clearly concerned in Georgia R.R. Bank Trust Co., supra (that is, whether FNBL is in a position to recover from Hannah, and, collaterally, assuming FNBL can not recover from Hannah, whether FNBL may assert contributory negligence against FAB for its failure to properly encode the check), are not presently before this Court. Therefore, we make no determination as to the proper allocation of loss between FNBL, the Federal Reserve, and FAB.
Concomitant with its argument of indorsement liability, FAB argues here, for the first time, that the defendants are also liable for breach of their § 7-4-207(2) engagement to honor. Section 7-4-207(2) provides:
 "In addition each customer and collecting bank so transferring an item and receiving a settlement or other consideration engages that upon dishonor and any necessary notice of dishonor and protest he will take up the item."
Relying upon this section, FAB contends that, as customers who transferred an item to a collecting bank and received consideration, Jackson and Greene fall squarely within the scope of this provision. As such, FAB maintains that formal notice of dishonor is not necessary to charge a customer under this provision and that final settlement for an item does not affect the collecting bank's right to recover under this section. While we make no determination as to whether formal notice of dishonor is a necessary prerequisite to a recovery under § 7-4-207(2), we can say unequivocally that final settlement does and must affect a collecting bank's right to recover.
Dishonor is a clear requirement under § 7-4-207. Section 7-3-507(1)(a) enumerates the instances when dishonor occurs:
 "An instrument is dishonored when a necessary or optional presentment is duly made and due acceptance or payment is refused or cannot be obtained within the prescribed time or in case of bank collections the instrument is seasonably returned by the midnight deadline."
FNBL made payment on the instrument within the prescribed time and retained the instrument beyond its midnight deadline. Both acts render payment final, and both acts preclude any subsequent dishonor of the instrument.
Because the $100,000 instrument was never dishonored by FNBL, neither indorsement liability under § 7-3-414, nor the defendants' engagement to honor the check under § 7-4-207(2), was implicated. *Page 977 
For this reason, the trial court's judgment cannot be affirmed based upon a theory of indorsement liability or engagement to honor.
III. Money Had and Received
The second theory of liability under which the trial court may have found the defendants liable in this case arises under the common law claim of money had and received.
Appellants argue that the UCC's statutory scheme for bank deposits and collections precludes FAB's recovery against its customers under a common law cause of action for money had and received, restitution, or unjust enrichment. While the appellants cite several cases that ostensibly support this position, we recognize that a split of authority exists among the states. See, Brannon v. First Nat'l Bank of Atlanta,137 Ga. App. 275, 223 S.E.2d 473, 476 (1976); First Georgia Bank v.Webster, 168 Ga. App. 307, 308 S.E.2d 579 (1983); but cf.,Greer v. White Oak State Bank, 673 S.W.2d 326 (Tex.Dist.Ct. App. 1984); Great Western Bank Trust v. Nahat, 138 Ariz. 260,674 P.2d 323 (Ariz.Ct.App. 1983); Demos v. Lyons, 151 N.J. Super. 489, 376 A.2d 1352 (1977); City Nat'l Bank v. CrockerNat'l Bank, 150 Cal.App.3d 290, 197 Cal.Rptr. 721 (Dist.Ct. App. 1983) (later vacated by agreement of the parties); CityNat'l Bank v. Crocker Nat'l Bank, 211 Cal.Rptr. 517,695 P.2d 1058 (1984). We are persuaded by the reasoning of the Texas District Court of Appeals in the case of Greer v. White OakState Bank, supra. In Greer, the court held that while a collecting bank could not recover against its customer as an indorser because it failed to give the indorser timely notice of dishonor, the collecting bank was not precluded from proceeding against him on a cause of action for money had and received:
 "As indicated Greer [and others] were all discharged, as indorsers, from any obligation on the check. Greer, however, was also a customer of the bank, and a recovery against him on a cause of action for money had and received, or unjust enrichment, was proper under the jury findings.
 "When a bank provisionally settles with its customer, and by reason of a dishonor of the item fails to receive the funds, it may revoke its settlement and charge the item back or obtain a refund from its customer. [Citations omitted.] Greer contends this remedy is exclusive and prohibits a recovery against him on equitable principles. But [UCC § 4-212(5)] provides that a failure to charge back or claim a refund does not affect other rights of the bank against the customer, and [UCC § 1-103] provides that unless displaced by other provisions of the code the principles of law and equity shall supplement its provisions. [Emphasis added.] Hence the equitable right of restitution is still available unless it conflicts with code provisions. [Citations omitted]. We find no provision of the code which conflicts with or abrogates the equitable right of a bank to proceed against its customer for restitution of funds which rightfully belong to the bank."
Id., at 329. Similarly, in Great Western Bank Trust v. Nahat,138 Ariz. 260, 674 P.2d 323 (Ariz.Ct.App. 1983), the court held that a collecting bank's right to charge back a dishonored check was lost by its failure to notify its customer of the dishonor within the required time, but that this did not preclude recovery from the customer on a theory of restitution:
 "[The collecting bank] concedes that it is not entitled to a chargeback because it failed to notify [the customer] of the check's dishonor within the required time. [Citations omitted.] It argues that this does not preclude recovery under a theory of restitution.
". . . .
 "Since restitution was adequately pled, we must next determine whether charge-back pursuant to [UCC § 4-212(1)] is an exclusive cause of action. We begin by recognizing that common law principles are incorporated into the commercial law of Arizona by [UCC § 1-103] unless displaced *Page 978 
by a particular statutory provision.
 "[The collecting bank] cites [UCC § 4-212(5)] to support its position that the remedy of restitution should be recognized. That statute provides:
 " 'A failure to charge back or claim refund does not affect other rights of the bank against the customer or any other party.'
 "By its terms [UCC § 4-212(5)] expressly recognizes that the right to charge-back is not an exclusive remedy.
 "Other jurisdictions have held that UCC § 4-212(1) . . . is not the sole remedy.
". . . .
 " . . . [W]e hold that the common law remedy of restitution was available to the bank."
Id., 674 P.2d at 326-27.
By the authority of Greer and Nahat, and the express provisions of §§ 7-4-212(5) and 7-1-103, we find that FAB is not precluded by the UCC from asserting and proving a right of recovery under the principles of money had and received. Thus, we next look to determine whether FAB adduced the necessary evidence to prove the elements of its case so that the trial court may have justifiably granted a recovery to FAB based upon this common law theory.
The cause of action for money had and received "is based upon the theory that one person shall not be unjustly enriched at the expense of the other, and is equitable in nature. That is to say, the action lies wherever one has received and holds money which in good conscience belongs to another, or where one wrongfully converts the property of another the tort may be waived and an action brought for the proceeds arising from such conversion." Christie v. Durden, 205 Ala. 571, 572, 88 So. 667,668 (1921). Thus, the question that this Court must answer by weighing the facts is whether the appellants received and held money that rightly belonged to FAB.
After a careful review of the record, we find that the evidence clearly indicates that the appellants paid good and valuable consideration in exchange for the $100,000 check issued them by Hannah. When we further consider FAB's failure to encode the instrument properly, the collecting banks' failure to remedy the error, FNBL's failure to compare the encoded amount of the draft against the true tenor of the check, FNBL's return of the instrument to Hannah, and the 41-day delay in notifying the appellants of the purported dishonor of the check, we can reach but one conclusion: the appellants were not unjustly enriched. If anyone, under these facts, could be found to have unjustly benefited from these turns of events, we would have to say it was Hannah. After all, it was he who received consideration for the $100,000 check, it was he who had but a tenth of what he truly owed debited from his account, and it was he who had the instrument upon which his obligation was based returned to him by FNBL. We note, also, that FAB currently holds a judgment against Hannah for the full amount of the $100,000 check.
The appellants, in contrast, were severely prejudiced by the actions of the banks. Forty-one days elapsed between the date of deposit and the date on which they were finally given notice of dishonor. It was during that period of time that Hannah apparently absconded with whatever funds remained in his account. Had FAB properly encoded the check, one of two things is certain. When the full and proper amount of the instrument was presented for payment to FNBL, either the full amount of the check would have been paid, or Hannah's stop payment order would have prevented payment and the check would have been dishonored and returned to the appellants. Obviously, in the first instance, no one would have been injured. In the second instance, however, the appellants would have been placed in a significantly better position to pursue Hannah, either to recover their consideration or to sue upon the instrument.
Because the appellants were not unjustly enriched, the judgment of the trial court cannot be affirmed based upon a theory of money had and received. *Page 979 
IV. Seizure and Set Off
In Alabama, a bank has the right of set-off to a customer's account when the bank and the customer are in a debtor-creditor relationship and there is mutuality of demands. First CityNat'l Bank of Oxford v. Long-Lewis Hardware Co., 363 So.2d 770,773 (Ala. 1978). The debtor-creditor relationship is created when a customer deposits money into a bank account, thus transforming the deposit into a debt owed by the bank to the customer. Rainsville Bank v. Willingham, 485 So.2d 319, 323
(Ala. 1986). Under Code 1975, § 7-4-212, FAB has a right of charge back for any credit given to the Azalea Management checking account if the item of credit was a provisional settlement that was later dishonored. "These rights to revoke, charge back and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final (subsection (3) of section 7-4-211 and subsections (2) and (3) of section 7-4-213)." Code 1975, § 7-4-212(1). Because the $100,000 check credited to the Azalea Management account became final within the meaning of the UCC, and because FAB failed to prove any right of restitution for the $100,000 credit to the Azalea Management account, FAB possessed no right of set-off against Azalea Management's account.
For the foregoing reasons, the judgment of the trial court must be reversed and the cause remanded.
REVERSED AND REMANDED.
HORNSBY, C.J., and JONES, ADAMS and KENNEDY, JJ., concur.
 ON APPLICATION FOR REHEARING
SHORES, Justice.
APPLICATION OVERRULED. OPINION MODIFIED.
HORNSBY, C.J., and JONES, ADAMS and KENNEDY, JJ., concur.