**CAGLE'S INC., Plaintiff,**

v.

**VALLEY NATIONAL BANK,**
**Defendant.**

No. CIV. A. 00–A–851–E.

United States District Court,
M.D. Alabama,
Eastern Division.

Aug. 3, 2001.

Ronald W. Self, Columbus, GA, A.L. Mullins, Jr., Kathy R. Bess, Atlanta, GA, for Plaintiffs.

James A. Byram, Jr., Donald R. Jones, Jr., Montgomery, for Defendants.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment filed by the Defendant, Valley National Bank, on February 16, 2001 (Doc. # 35).

The Plaintiff, Cagle's Inc. ("Cagle") filed a Complaint in this case on June 30, 2000. This court granted a Motion for More Definite Statement filed by Valley National Bank ("the Defendant")[1] requiring Cagle to file an amendment to the Complaint which identifies the Alabama Uniform Commercial Code ("Alabama UCC") claims which Cagle intended to assert. Cagle asserts claims for violation of the duty of good faith and ordinary care under the Alabama UCC (Count I), simple negligence (Count II), gross negligence (Count III), punitive damages (Count IV), attorneys' fees (Count VII).[2]

The court issued an Order on July 13, 2001 setting the Motion for Summary Judgment for oral argument and identifying some issues upon which the parties should be prepared to argue. Oral argument was held on July 26, 2001.

For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED.

---

1. The court refers to Valley National Bank as the Defendant to avoid confusion because that bank is now known as Frontier National Bank.

2. There are no counts V or VI in the Complaint as amended.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable infer-

ences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. FACTS

The submissions of the parties establish the following facts:

At the outset, the court notes that the Defendant has acknowledged that there are disputed facts in this case, but argues that those facts are not legally significant. Cagle, on the other hand, argues that the disputed facts present genuine issues of material fact for trial.

Cagle owns and operates a poultry processing plant in Pine Mountain Valley, Georgia. For ten years prior to her arrest in July of 1998, Kea Martin ("Martin") was employed by Cagle as Accounts Payable Clerk. Danny Bridges ("Bridges") was her immediate supervisor. Martin banked at the Defendant's Valley, Alabama branch. Her landlord, Bill Hayes ("Hayes") lived on the same property that she lived on with her husband and three children. Hayes is the president of the Defendant's Valley, Alabama branch.

Martin had a poor banking history with the Defendant. She had a loan from 1988 which was in default, her checking account often reflected a small monthly balance which consisted almost entirely of her payroll direct deposit from Cagle in the amount of $218.24 per week, and she had large number of non-sufficient fund charges over the years. Around November 1996, when she married her husband, Martin falsely informed her husband that

she had a large trust fund which had been set up by her biological father. She also told Hayes that she was expecting an inheritance from her biological father and might be depositing money at the Valley, Alabama branch.

When Martin's husband urged her to access money from her fictitious trust fund, she used her knowledge of Cagle's system to embezzle funds. Martin engaged in an elaborate system whereby she manipulated the system's client directory and printed checks payable to herself for sums that were supposed to be paid to two of Cagle's vendors. The vendor numbers appeared on the checks. She deposited these checks in an account which she opened at the Defendant's Valley, Alabama branch. The check dates and amounts were as follows:

| | |
|---|---|
| October 14, 1997 | $ 75,764.70 |
| October 14, 1997 | $200,913.76 |
| November 18, 1997 | $194,470.79 |
| April 2, 1998 | $395.384.55 |
| July 1, 1998 | $272.077.23 |

Each check was made payable to Martin, was endorsed by her, and was deposited into an account which bore her name at the Defendant's Valley, Alabama branch. No one at the Defendant's Valley, Alabama branch ever confronted Martin about these deposits. According to testimony cited by Cagle, the bank tellers had been directed by Hayes to accept deposits from Martin. Only on one occasion was Martin called by an employee of the Defendant, Gwen Reese, who informed her that a $200,000 check she had made and drawn on one of her accounts was not good. Martin had been giving money away and purchasing real estate, causing her to have insufficient funds in her bank accounts. She then used her accounts at Defendant bank and an account she opened at First Union Bank in Pine Mountain and shuffled checks between those accounts until she could embezzle more funds from Cagle.

The Defendant then presented the checks deposited by Martin to Cagle's bank, SouthTrust, for payment, and South-Trust paid them in a timely manner without objection. SouthTrust sent the cancelled checks, along with monthly bank statements, to Cagle. Cagle first reported that the checks were unauthorized in July of 1998. Cagle had Martin arrested and has recovered a substantial portion of the embezzled funds.

## IV. DISCUSSION

The court will separately address Cagle's UCC and common law negligence and gross negligence claims and the grounds for summary judgment which have been asserted as to those claims.

### A. UCC Claims

Cagle has argued that the Defendant breached its duty of good faith and its duty to act in a commercially reasonable manner by failing to inquire of Martin as to the source of funds that she was depositing at the Defendant's Valley, Alabama branch. The Defendant has raised several defenses to these claims including: that Cagle's claims are barred by its failure to report the unauthorized checks in a timely manner, the UCC's same wrongdoer rule bars Cagle's claims, the UCC's final payment rule bars Cagle's claims, and the Defendant is not liable because the loss was due to Cagle's negligence, not the Defendant's negligence.

As to the defense that Cagle's claims are barred by the 180 day rule, the Defendant concedes that even if the 180 day rule operates to bar claims based on some of the checks, it does not bar the claims based on the last two checks deposited by Martin. The 180 day rule is contained in Alabama Code § 7–4–406(f) and provides as follows:

Without regard to care or lack of care of either the customer or the bank a customer who does not within 180 days after the statement and the items ... are sent to the customer ... discover and report the customer's unauthorized signature on ... the item is precluded from asserting against the bank the unauthorized signature.

*Ala.Code* § 7–4–406(f). Cagle argues that this provision applies only to claims raised by the drawee bank, in this case, South Trust, and not to the depository bank, because it was SouthTrust, and not the Defendant, which sent account statements and cancelled checks to Cagle. In support of its argument, Cagle points to the Comment following the statute which provides that "[t]he notice requirements in subsection (f) are the periods within which the customer must notify the drawee bank of the fraud or be absolutely barred from recovery." *Ala.Code* § 7–4–406(f), Comment.

Cagle's interpretation of the Comment following the 180 day rule is that since only the drawee bank must be notified, only claims against the drawee bank are barred. Cagle relies on two cases to support this interpretation. *See AmSouth v. Reliable Janitorial Service, Inc.*, 548 So.2d 1365 (Ala.1989); *East Gadsden Bank v. First City National Bank of Gadsden*, 50 Ala.App. 576, 281 So.2d 431 (1973). These cases, however, were decided before § 7–4–406(f) was changed in 1995. *See* Plaintiff's Brief in Opposition, page 14.

The Defendant argues that this court ought not to follow the interpretation of the notice provision in the cases relied on by Cagle because those courts were interpreting a different notice provision, and by amending the provision the legislature allowed for broader applicability. Also according to the Defendant, the distinction between those cases as indorsement cases and the instant case as an unauthorized

signature case is significant because a depositor bank is in as good or better position to determine if the drawer contributed to a forgery, *see East Gadsden*, 281 So.2d at 434, while in the case of an unauthorized drawer's signature, the drawee is in the better position to determine whether the signature is authorized because the drawer is the drawee bank's customer.

The Defendant further points out that a later decision expressly applied the notice provision as it is currently written to bar claims against a depository bank. *See SpanCom Services, Inc. v. SouthTrust Bank, N.A.*, 744 So.2d 931 (Ala.Civ.App. 1999). The case was decided by the Alabama Court of Civil Appeals after having been appealed to the Alabama Supreme Court from a state circuit court and deflected to the civil appeals court pursuant to *Ala.Code* § 12–2–7(6). *Id.* at 932. In *SpanCom*, an employee had written unauthorized checks on the employer's account and had deposited them in his personal account at Southtrust. The employer's bank was Compass bank. The employer notified Compass about the unauthorized checks more than a year after discovering the unauthorized checks and did not notify SouthTrust. The court determined that under § 7–4–406(f), the employer was absolutely barred from recovering damages, regardless of whether SouthTrust or Compass were negligent. *Id.* at 933.

■ The *SpanCom* case applies by analogy in this case. Here, although both the Defendant and SouthTrust were notified about unauthorized checks, notification on three of the checks fell well outside of the statutory period. While an argument can certainly be made that this 180 day rule should not apply to depository banks, support for that argument is drawn from cases decided prior to amendment of the statute. The *SpanCom* case, the only case applying the statute as presently written,

squarely applies the notice provision to bar a claim against a depository bank. This court has diversity jurisdiction and is therefore bound to apply the law as it has been stated by the Alabama courts. *Davis v. National Medical Enterprises, Inc.,* 253 F.3d 1314, 1318 (11th Cir.2001). Therefore, the claims against the Defendant on the first three checks are barred under the Alabama UCC.

The Defendant also argues that it is entitled to summary judgment on the claims on all of the unauthorized checks deposited by Martin, based on the U.C.C.'s final payment rule. Under that provision

(a) Except as provided in subsection (c), if the drawee of a draft pays or accepts the draft and the drawee acted on the mistaken belief that ... the signature of the drawer of the draft was authorized, the drawee may recover the amount of the draft from the person to whom or for whose benefit payment was made or, in the case of acceptance, may revoke the acceptance. Rights of the drawee under this subsection are not affected by failure of the drawee to exercise ordinary care in paying or accepting the draft.

\* \* \* \* \* \*

(c) The remedies provided by subsection (a) ... may not be asserted against a person who took the instrument in good faith and for value or who in good faith changed position in reliance on the payment or acceptance. This subsection does not limit remedies provided by Section 7–3–417 or 7–4–407.

*Ala.Code* § 7–3–418.

The Defendant states that although the provision expressly applies to actions brought by drawee banks against depository banks, it also applies to actions brought

by drawers against depository banks. *See Perini Corp. v. First Nat. Bank of Habersham County,* 553 F.2d 398, 417 (5th Cir. 1977).[3] Cagle does not dispute that this provision applies to claims brought by drawers against depository banks, therefore, the court does not address that issue. Cagle's argument with respect to the final payment rule is that the Defendant did not act in good faith. Plaintiff's Brief in Opposition, page 32. Cagle has argued that the facts in this case present a jury question as to whether the Defendant possessed constructive knowledge sufficient to impute knowledge of the unauthorized nature of Martin's checks. Cagle relies on, among other evidence, evidence that the checks were from Cagle's and so were inconsistent with the mistaken belief that Martin had received an inheritance, and the check amounts were far in excess of the deposits which were still being made in Martin's account each month in payment of her salary.

The Defendant has argued that none of Cagle's evidence is sufficient to establish a lack of good faith because there is no evidence that the Defendant subjectively acted in bad faith, and the standard to be applied is a subjective, not an objective standard. Cagle disagrees. Cagle points out that the Eleventh Circuit, applying the definition of good faith in *Alabama Code* § 7–1–201(19), stated that Alabama "has embraced a test that is composed of both a subjective component and an objective component." *In re Joe Morgan, Inc.,* 985 F.2d 1554 (11th Cir.1993).

 The difficulty with relying on this Eleventh Circuit holding is that the relevant statute was amended in 1995, after the Eleventh Circuit ruled in *In re Joe Morgan, Inc. See Ala.Code* § 7–3–

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

103(a)(4), History. "Good faith" is currently defined in Article 3 as "honesty in fact in the conduct or transaction concerned." *Ala. Code* § 7–3–103(a)(4). This definition is the same definition as the definition of "good faith" which is found in *Alabama Code* § 7–1–201(19). According to the Comment to the Alabama Code, when the legislature adopted the definition of good faith as it is defined in § 7–3–103(a)(4), the legislature rejected the proposed change by the UCC National Drafting Committee to expand the good faith concept to include observance of reasonable commercial standards of fair dealing. *Ala. Code* § 7–3–103, Alabama Comment 1. As the Comment explains, the definition which was adopted sets a " 'subjective' standard," while the rejected proposed change provided more of an objective standard. *Id.* Under this commentary, which is afforded substantial weight, therefore, the court must conclude that the good faith definition to be applied in the provision at issue is a subjective standard. *Cf. Simmons v. Clemco Industries*, 368 So.2d 509, 514 (Ala.1979)(while not controlling, the official comments are a valuable aid in the construction of code provisions).

Cagle argues in brief that the Comment to the definition which describes the amendment and the legislature's intent actually supports applying, rather than distinguishing on the basis that the statute has been amended, the Eleventh Circuit's description of "good faith" as having both a subjective and objective component. The Comment states that Alabama in adopting revised Articles 3 and 4 retains the good faith definition now found in subsection § 7–1–201(19), and also states that rather than introduce a new and uncertain standard to the law of negotiable instruments, "Alabama chose to retain the existing good faith definition." § 7–3–103, Comment 1. Cagle argues, therefore, that the statutory definition actually retained a standard which is both subjective and objective. In other words, Cagle states, based on the Eleventh Circuit's case, that the definition which existed prior to the amendment contained both a subjective and an objective component, so by retaining the definition, both a subjective and objective component are present in the definition as it is currently written.

It is without dispute that the language of § 7–3–103(a)(4) as it is currently written is the same as the language in § 7–1–201(19). The question is, therefore, whether this definition is to be applied as written on its face, or whether there is a judicial gloss upon the definition of § 7–1–201(19) which imports a constructive component which must be applied under § 7–3–103(a)(4).

It is also clear that the Eleventh Circuit found that there was a judicial gloss importing an objective requirement under § 7–1–201(19). What is not at all clear, however, is, if this judicial gloss of an objective component was not intended by the legislature to apply under the new § 7–3–103(a)(4), why the drafters of the commentary chose the word "retains," in light of the Eleventh Circuit's holding and the cases upon which the Eleventh Circuit relied in *In re Joe Morgan, Inc.* Perhaps the word "retains" sprang from those Alabama cases decided prior to the amendment of the statute which applied a purely subjective standard of good faith. *See C & N Contractors, Inc. v. Community Bancshares*, 646 So.2d 1357, 1361 (Ala.1994)(citing § 7–1–201(19) and citing with approval a Fifth Circuit Court of Appeals decision holding that failure to follow reasonable commercial practices did not constitute a lack of good faith); *Frank Davis Buick AMC–Jeep, Inc. v. First Alabama Bank of Huntsville*, 423 So.2d 855, 858 (Ala.Civ.App.1982)(identifying the standard in § 7–1–201(19) as a subjective standard); *General Electric Credit Corp. v.*

*Humble,* 532 F.Supp. 703, 706 (M.D.Ala. 1982)(same). In any event, regardless of the cases applying an objective component before the statute was amended, the comment to § 7–3–103 clearly states that the definition adopted is a subjective standard. *Ala.Code* § 7–3–103, Comment 1. It is only logical to accept that the definition in § 7–3–103(a)(4) was intended by the legislature to have only a subjective component. Had the legislature wanted to define "good faith" as having both a subjective and an objective component, it would have been a simple matter to simply adopt the definition proposed by the drafters of the Uniform Commercial Code. By rejecting this definition, the legislature rejected a definition which clearly applies both a subjective and objective standard, which, as the comment explains, means that this court is to interpret "good faith" as being a subjective test.

At oral argument on the Motion for Summary Judgment, Cagle raised the additional argument that the judicial gloss on the meaning of "good faith," that is, that there is an objective component to the definition, survives notwithstanding the legislature's rejection of an objective component in favor a completely subjective standard. To the extent that such a gloss was present in the case law at the time of the *In re Joe Morgan* decision, such a gloss was not applied by the Alabama Supreme Court in *C & N Contractors,* a case decided subsequent to *In re Joe Morgan.*[4] Any federal court sitting in diversity must follow the decisions of the state court.

*Flintkote Co. v. Dravo Corp.,* 678 F.2d 942, 945 (11th Cir.1982).

Because this court must apply the statute as it is written, and cannot apply case law which is inconsistent with the plain language of the statute and which preceded the amendment of the statute adopting the definition as it is currently written, the court must apply a purely subjective definition of "good faith." Since Cagle does not purport to create a question of fact as to good faith under a subjective standard, summary judgment is due to be GRANTED as to the claims under Count I.[5]

### B. Negligence Claims

Cagle seeks in Counts II and III to bring claims for common law negligence and gross negligence. The Defendant moves for summary judgment on these claims arguing that the claims are displaced by the Alabama UCC and that, even if the claims are not displaced, Cagle was contributorily negligent.

■ The parties first dispute the law which is to be applied in analyzing this issue. The Defendant argues that Alabama law applies because the Alabama Code states that the "liability of a bank for action or non-action with respect to an item handled by it ... is governed by the law of the place where the bank is located." *Ala.Code* § 7–4–102(b). Cagle has argued in response that this court should apply Georgia law under the Alabama choice of law rule that the substantive rights of a party are determined according to where the injury occurred. *See Norris*

---

4. Although the Plaintiff, in supplemental briefing, states that *C & N Contractors* does not expressly define "good faith," the opinion, in discussing good faith under § 7–1–201(19), does cite to another case for the proposition that the failure to follow reasonable commercial practices does not constitute a lack of good faith. *C & N Contractors,* 646 So.2d at 1361. Accordingly, this court must conclude

that the definition of good faith relied on in *C & N Contractors,* which was decided subsequent to *In re Joe Morgan,* does not include an objective component.

5. Because summary judgment is due to be granted on this basis, the court will not address the other defenses the Defendant has raised as to Count I.

*v. Taylor*, 460 So.2d 151, 152 (Ala.1984). Cagle further argues that under Georgia law, Cagle can proceed on a common law negligence claim in addition to a claim under the UCC.[6] In support of this argument, Cagle cites to *First Georgia Bank v. Webster*, 168 Ga.App. 307, 308 S.E.2d 579, 581 (1983).

Even if the court were to adopt Cagle's view on the choice of law provision, however, this would not necessarily mean that the state law claims would survive displacement by the UCC. In *Webster*, the Georgia Court of Appeals allowed a negligence claim to proceed against a bank, but the claim was based on the bank's negligence in informing its customer that a check "was 'good.'" *Id.* at 580. The court's reasoning was that while the UCC provides a remedy for the negligent violation of the duty it imposes, it does not provide relief from the common law negligence alleged to have occurred in that case. *Id.* at 581. The Eleventh Circuit interpreted Georgia law to be that "common law remedies are available when the theory of recovery falls outside the confines of the UCC." *Dibrell Brothers International S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1581–82 (11th Cir. 1994); *see also Crosson v. Lancaster*, 207 Ga.App. 404, 427 S.E.2d 864 (1993)(finding claim governed by UCC because permitting an action in negligence despite the bank's showing that it met the statutory requirement of acting in good faith would thwart the purposes of the code).

Applying Georgia law regarding displacement under the UCC poses its own difficulties, however, because Cagle's UCC claim is asserted under Alabama, not Georgia law. As the Defendant pointed out at oral argument, applying the Georgia UCC, when there is an Alabama UCC claim, to determine if the common law claim is displaced by the UCC places the court in an untenable position. The Defendant has also, however, pointed to a possible solution to this dilemma, that being that under the Georgia UCC, like the Alabama UCC, the law to be applied is the law of the state where the bank is located. *See Ga.Code Ann.* § 11–4–102(2)(1994). Therefore, rather than apply principles of displacement under the Georgia UCC, since the defendant has raised the issue of displacement of state law claims, this court, applying Georgia law to the tort claims, looks to the Georgia UCC to determine what law governs the liability of a bank in a case like this, which then directs the court to the UCC of the state where the bank is located, Alabama. The court would then apply Alabama displacement principles. Only if the Alabama UCC allows the prosecution of the common law claims would the court then look to Georgia law for the substantive law of those tort claims.

■ The court agrees with this analysis by the Defendant. Application of the choice of law principles under the foregoing analysis may, however, be an unnecessary complication. A federal district court sitting in diversity is required to apply the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Alabama UCC provides a choice of law provision in § 7–4–102(b), which provides that "liability of a bank for action or non-action with respect to an item handled by it … is governed by the law of the place where the bank is located." *Ala.Code* § 7–4–102(b). As the Official Comment to *Alabama Code* § 7–4–102(b) states, the choice of law provision in the UCC which governs banks "is designed to state a workable rule for the solution of otherwise vexatious problems of

---

**6.** Of course, Cagle has brought a claim under the Alabama UCC, not the Georgia UCC. This is an issue that the court discusses more fully *infra*.

the conflicts of laws ..." *Id.*, Official Comment 2. The Comment goes on to state that the nature of bank collections makes it imperative that one law govern the activities of one office of a bank. *See id.* Comment 2(b). If a bank were to be subjected to the laws of a jurisdiction outside of the jurisdiction in which it was located, whether those laws were common law or statutory, the business of bank collections would be impaired, and the purpose of the UCC would be thwarted.

The Defendant has cited the court to one case which has interpreted the official comment to a statute similar to *Alabama Code § 7–4–102(b)* and has determined, consistent with this court's interpretation of the Alabama UCC provision, that the rationale in the official comment would apply to theories outside of the UCC, such as negligence claims. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Devon Bank,* 702 F.Supp. 652, 657 (N.D.Ill.1988). The court is persuaded by the language of the statute, by the interpretive Comment, and by the *Devon Bank* case that Alabama's UCC displacement principles are properly applied.[7] Having concluded that the Alabama UCC applies, the court now turns to the question of whether the negligence claims asserted in this case are displaced by the Alabama UCC.

■ Under the Alabama UCC, "[u]nless displaced by the particular provisions of this title, the principles of law and equity ... shall supplement its provisions." *Ala.*

*Code § 7–1–103.* This section applies to principles of law and equity, without limitation as to jurisdiction.

Although Alabama has not clearly spoken on the question of displacement of common law claims by the Alabama UCC, there are cases which have touched upon the issue. For instance, in *Azalea City Motels, Inc. v. First Alabama Bank of Mobile,* 551 So.2d 967, 977 (Ala.1989), the court determined that a claim for money had and received was not displaced by the Alabama UCC's statutory scheme for bank deposits and collections. The court relied on cases from other jurisdictions which allowed for claims of money had and received or for restitution where the claims did not conflict with other provisions of the code. *Id.* While this case certainly leaves the door open for finding that there are common law claims which are not displaced by the Alabama UCC, it does not speak to negligence claims, which are the claims at issue here.

■ In *C & N Contractors, Inc.,* the court stated that it need not decide generally whether § 7–3–405(1)(c) displaces common law claims of negligence and wantonness because the plaintiffs presented no authority that the claims were not displaced. *C & N Contractors, Inc. v. Community Bancshares, Inc.,* 646 So.2d 1357, 1362 (Ala.1994). The court did explicitly state, however, that § 7–3–405(1) "appears to displace an action for common law negligence or wantonness ...." *Id.*[8] The court

**7.** At oral argument, counsel for Cagle questioned the persuasiveness of the statement regarding choice of law in the *Devon Bank* decision, arguing that the court ultimately concluded that negligence claims were not displaced. While it is true that the court concluded that some negligence claims were not displaced, the court also concluded that several of the negligence claims were displaced. *Devon Bank,* 702 F.Supp. 652, 665. Whether or not the common law claims were displaced is a separate issue from the choice

of law provision to be applied. That is to say, whether or not Alabama UCC displaces the common law claims at issue is a separate question from the question of whether the choice of law provision in the Alabama UCC applies.

**8.** A federal court sitting in diversity must follow statements of law, even those expressed in dicta, because the diversity court is bound to decide the case the way the state supreme court would decide it. *Towne Realty, Inc. v. Safeco Ins. Co. of America,* 854 F.2d 1264,

ultimately affirmed the trial court's grant of summary judgment, which was based on the UCC displacing the negligence and wantonness theories. *Id.*

Cagle's argument that the claims are not displaced is that Alabama has not answered this question, and that other jurisdictions have concluded that not all negligence actions are displaced. Cagle Brief in Opposition, page 40. Cagle offers no authority to show that Alabama UCC would not displace negligence claims under any circumstances, nor any explanation as to why its negligence claims, which as pleaded are based on the same facts as the UCC claims, would not be displaced if displacement principles apply. This court is, therefore, in a position very similar to the *C & N Contractors* court, in that the plaintiff has failed to demonstrate that its claims are not displaced. *See id.*[9]

The court takes from the Alabama cases discussed the idea that common law claims may not necessarily be displaced by the UCC, but if they are inconsistent with the statutory scheme of remedies and defenses provided by the UCC, they are displaced. This view is consistent with the view of many courts, as expressed in a case relied upon by Cagle, that the UCC does not displace a common law tort unless reliance on the common law would thwart the purposes of the Code. *See Sebastian v. D & S Express, Inc.,* 61 F.Supp.2d 386, 391 (D.N.J.1999). Accordingly, negligence theories might not be displaced by the UCC, but only if the common law theory asserted does not otherwise conflict with the statutory scheme of the UCC.

The Defendant has essentially argued that its UCC defenses to the claim assert-

ed under the Alabama UCC also displace any common law claim, and to conclude otherwise would be to allow remedies where its conduct would not have given rise to liability under the Alabama UCC. The court must agree that finding that Cagle could pursue common law negligence claims potentially would allow for the Defendant to be held liable for allegedly negligent acts, which are insufficient to establish liability under the Alabama UCC, which provides a subjective, good faith defense, or to be held liable for conduct which is time-barred under the Alabama UCC. Allowing such claims would, therefore, thwart the purpose of the Alabama UCC by making actionable that for which the Alabama UCC has provided defenses. *See Perini Corporation v. First National Bank of Habersham County, Georgia,* 553 F.2d 398 (5th Cir.1977)(applying Georgia law and concluding that negligence and restitution claims which would allow recovery without demonstrating bad faith, or without being subject to notice defenses, are barred by the protections of the final payment rule). Accordingly, the court concludes that Cagle's common law negligence and gross negligence claims are displaced by the Alabama UCC, and that summary judgment is due to be GRANTED as to Cagle's common law claims.

The Defendant has also moved for summary judgment on the issue of attorneys' fees and punitive damages. As summary judgment is due to be granted as to the substance of Cagle's claims, summary judgment is also due to be GRANTED as to the claims for attorneys' fees and punitive damages.

---

1269 n. 5 (11th Cir.1988) ("when considering a diversity case under state law, we are bound to decide the case the way it appears the state's highest court would, and we would be violating that duty to ignore the fact that this statement [of dicta] was made .").

**9.** Although asked at oral argument, neither side requested that this issue be certified to the Alabama Supreme Court.

## V. *CONCLUSION*

For the reasons discussed, the court concludes that the Motion for Summary Judgment is due to be GRANTED. A separate Order will be entered in accordance with this Memorandum Opinion.

### *ORDER and JUDGMENT*

In accordance with the Memorandum Opinion entered on this date, it is hereby ORDERED that the Motion for Summary Judgment is GRANTED. Judgment is entered in favor of the Defendant, Valley National Bank, now known as Frontier National Bank, and against the Plaintiff, Cagle's Inc.

Costs are taxed against the Plaintiff.